In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3085

SAMUEL RILEY,

*Plaintiff-Appellee,*

*v.*

ROD R. BLAGOJEVICH *et al.,*

*Defendants-Appellants.*

No. 04-3436

THOMAS SNYDER,

*Plaintiff-Appellant,*

*v.*

ROD R. BLAGOJEVICH *et al.,*

*Defendants-Appellees.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 04 C 1296, 04 C 1291—**Amy J. St. Eve**,
**Milton I. Shadur**, *Judges.*

_____

ARGUED SEPTEMBER 7, 2005—DECIDED SEPTEMBER 23, 2005

_____

Before BAUER, POSNER, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* We have consolidated for argument
and decision two essentially identical cases, though decided

differently by the district judges. In both, assistant wardens of Illinois state prisons, fired by the governor of the state because they are not of his political party, contend that they are not policymaking officials or confidential employees and therefore that for the governor to have fired them on the basis of their political affiliation violated their right of free speech. They seek compensatory and punitive damages. In the case of Riley, who was assistant warden for operations at a prison that has some 700 inmates, Judge St. Eve denied the defendants' motion to dismiss, which asserted qualified immunity (and so the denial, though interlocutory, was an appealable order), and they appeal. In the case of Snyder, who before he was fired was the assistant warden for programs at a somewhat smaller prison, Judge Shadur granted summary judgment for the defendants, and Snyder appeals.

The Supreme Court has held in the name of freedom of speech that a public official cannot be fired on the basis of his political affiliation unless the nature of his job makes political loyalty a valid qualification; this could be either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts. *Elrod v. Burns*, 427 U.S. 347, 367-68 (1976); *Branti v. Finkel*, 445 U.S. 507, 518 (1980). Identifying those jobs is no mean feat. Almost all jobs in government above the lowest levels require the holder of the job to exercise at least a modicum of discretion; and discretion exercised by a subordinate, invisible to the public, who is a political enemy of the elected officials who are blamed when things go wrong can undermine the officials' programs (often just by passive resistance) and by doing so thwart democratic preference.

Above the lowest levels of the civil service the question is not discretion or no discretion but less or more, and in such cases drawing a line is inescapably arbitrary, as the following summary of our previous cases suggests:

| Political Affiliation Held to Be Permissible Qualification | | | Political Affiliation Not Held to Be Permissible Qualification | | |
|---|---|---|---|---|---|
| Position | Case | Procedural Posture | Position | Case | Procedural Posture |
| General Inspector, City Health Dep't | *Heck v. City of Freeport*, 985 F.2d 305 (7th Cir. 1993) | Summary Judgment ("SJ") | Prison Warden | *Kiddy-Brown v. Blagojevich*, 408 F.3d 346 (7th Cir. 2005) (ruling not on merits) | 12(c) |
| Deputy Sheriff | *Upton v. Thompson*, 930 F.2d 1209 (7th Cir. 1991); *Dimmig v. Wahl*, 983 F.2d 86 (7th Cir. 1993) | SJ; 12(c), respectively | Deputy Sheriff | *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000) (dictum) | 12(b)(6) |
| Subdistrict Superintendent, State Dep't of Highways | *Selch v. Letts*, 5 F.3d 1040 (7th Cir. 1993) | Judgment as a Matter of Law ("JMOL") | Human Resources Administrator | *Milazzo v. O'Connell*, 151 F.3d 587 (7th Cir. 1998) (per curiam) | 12(b)(6) |
| Deputy County Auditor | *Kline v. Hughes*, 131 F.3d 708 (7th Cir. 1997) | SJ | Chief Deputy, County Sheriff's Electrical Monitoring Unit | *Kolman v. Sheahan*, 31 F.3d 429 (7th Cir. 1994) | 12(b)(6) |
| State Deputy Attorney General | *Americanos v. Carter*, 74 F.3d 138 (7th Cir. 1996) | 12(b)(6) | Paralegal (in state's attorney's office) | *Hernandez v. O'Malley*, 98 F.3d 293 (7th Cir. 1996) | 12(b)(6) |

| Political Affiliation Held to Be Permissible Qualification | | | Political Affiliation Not Held to Be Permissible Qualification | | |
|---|---|---|---|---|---|
| Interim Executive Director, County Housing Authority | *Garcia v. Kankakee County Housing Authority*, 279 F.3d 532 (7th Cir. 2002) | SJ | Special Investigator (in state's attorney's office) | *Carlson v. Gorecki*, 374 F.3d 461 (7th Cir. 2004) | SJ |
| Board of Zoning Appeals Member | *Pleva v. Norquist*, 195 F.3d 905 (7th Cir. 1999) | 12(b)(6) | County Correctional Officer | *Flenner v. Sheahan*, 107 F.3d 459 (7th Cir. 1997) | 12(c) |
| Regional Administrator and Asst. Regional Administrator, State Dep't of Children & Family Services | *Ryan v. Ill. Dep't of Children & Family Services*, 185 F.3d 751 (7th Cir. 1999) | JMOL | Dispatcher (in sheriff's office) | *Zorzi v. County of Putnam*, 30 F.3d 885 (7th Cir. 1994) | SJ |
| Chief ALJ | *Thompson v. Ill. Dep't of Professional Regulation*, 300 F.3d 750 (7th Cir. 2002) | 12(b)(6) | City Court Coordinator | *Mitchell v. Randolph*, 215 F.3d 753 (7th Cir. 2000) | SJ |

In general, employees who have merely ministerial duties—who really have very little discretion—and employees whose discretion is channeled by professional rather than political norms (a surgeon often exercises judgment, but it is professional rather than political judgment), are not within the exception for policymakers. But the line between professional and policy judgment is often blurred; for example, is the physician who runs a county hospital making a professional judgment or a policy judgment if he decides to authorize the hospital's physicians to assist suicides, prescribe "medical marijuana," or perform abor-

tions? And an administrator will often exercise both professional and broader policy responsibilities; this further complicates classification.

The uncertainty in the case law demonstrated in our table (similar tables could be constructed for the other federal courts of appeals), although somewhat exaggerated because the same title can denote quite different levels of responsibility—a deputy sheriff could be a policeman in one sheriff's department and the second in command in another—creates a dilemma for elected officials such as the Governor of Illinois. How is he to know, when he takes office, whom he can fire and replace with loyalists, and whom not? Must he go behind the job descriptions and conduct an investigation into the actual duties performed by all the state employees who might be deemed policymaking or confidential employees, under pain of having to pay damages if a jury disagrees with the results of his inquiry? To what extent can he rely on the doctrine of qualified immunity to shield him from the consequences of such a disagreement? "Public officials need not predict, at their financial peril, how constitutional uncertainties will be resolved." *Hosty v. Carter*, 412 F.3d 731, 739 (7th Cir. 2005) (en banc).

It seems to us that if no basis is presented for thinking the official job descriptions systemically unreliable in a sense to be explained, the elected officials can rely on them, even if a plaintiff is prepared to testify (self-servingly) that the job description doesn't actually describe what he does, thus precipitating a factual inquiry likely to be protracted and inconclusive. "Our focus is on the 'inherent powers' of the office, not what any individual officeholder actually does." *Meeks v. Grimes*, 779 F.2d 417, 419 n. 1 (7th Cir. 1985); see also *Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir.

1996); *Tomczak v. City of Chicago*, 765 F.2d 633, 640-41 (7th Cir. 1985); *Roldan-Plumey v. Cerezo-Suarez*, 115 F.3d 58, 62 (1st Cir. 1997). (We take "inherent" to mean simply within the scope of the description.) "[S]uch inquiry [into whether the job is one for which political affiliation is a permissible criterion because it involves either policymaking or confidentiality] presents a question of law informed solely by the job description and the powers of office." *Danahy v. Buscaglia*, 134 F.3d 1185, 1191 (2d Cir. 1998). "The idea that job performance (rather than job description) should control *Elrod-Branti* analysis has been consistently rejected by this court and others." *Gordon v. County of Rockland*, 110 F.3d 886, 888 (2d Cir. 1997), citing (besides our decision in *Meeks*) *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993), and *Williams v. City of River Rouge*, 909 F.2d 151, 154 (6th Cir. 1990). Otherwise the courts—and the elected officials—would have "the burden of having to re-examine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder." *Tomczak v. City of Chicago*, *supra*, 765 F.2d at 641; see also *De Abadia v. Izquierdo Mora*, 792 F.2d 1187, 1192-93 (1st Cir. 1986).

These cases also refer to the importance of providing guidance to litigants. Incoming political leaders should be enabled to discover without protracted inquiry which jobs they can fill. Furthermore, "a new administration should not be overly hamstrung in filling key positions with loyal employees simply because of the way the prior administration operated." *Hadfield v. McDonough*, 407 F.3d 11, 18 (1st Cir. 2005). Nor would it be sensible to give employees who are assigned policy duties an incentive to try to protect their jobs simply by not performing those duties.

For the job description to be the pivot on which the case

turns, inquiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to drift far from the actual duties of the position; and, in short, on how reliable, how authoritative, the description is. The descriptions of the assistant-warden positions in the Illinois state prison system score well on this test. Not that each is an exact description of what every assistant warden for operations or for programs does, for there are dozens of assistant wardens distributed across the state's prisons and their activities must differ in accordance with the conditions of their prison, the leadership style of the warden, and their own ideas and initiative. But each of the two descriptions is a *reliable* description rather than something that has been manipulated by officials seeking to expand their power to appoint loyalists beyond the lawful bounds.

The description of Snyder's job (assistant warden for programs) has not been changed materially since 1989, which is long before Blagojevich became governor, and while only the current description of Riley's job is in the record, we are given no reason to think that it has changed over the years either. Job descriptions are made and updated by the state's Department for Central Management Services and reviewed by the Civil Service Commission, 20 ILCS 415/8a(1), 415/10(4); 80 Ill. Admin. Code § 301.20, and though those two agencies are part of the executive branch we are again given no suggestion that Blagojevich or any other political official has been tinkering with the assistant-warden job descriptions. The descriptions are "public records and shall be open to public inspection." 20 ILCS 415/14. Any job holder who thinks the official description of his job inaccurate can challenge it and, if he succeeds in showing that it is inaccurate, get it changed. 20 ILCS

415/8a(1); 80 Ill. Admin. Code § 301.20. It might seem that only a job holder who thought that the description understated his duties would seek a change, in order to buck for a raise. That is not correct. A job holder does not want his job description to list duties that he does not perform, because the discrepancy will make it easy for his superiors to fire him for inadequate performance.

With these checks and balances designed to make the official job description accurate, the state is entitled to rely on it to reveal the scope of the job holder's duties and enable the court to determine whether the duties bring the job into the circle within which elected officials are entitled to demand political loyalty. So let us turn to the descriptions. The description of the job of assistant warden for operations (Riley's job) is as follows:

> Subject to administrative approval of the Warden, . . . serves as Assistant Warden of Operations: formulates, organizes, and directs the overall Operations Program for Tamms Correctional Center; supervises staff; maintains and enforces disciplinary, safety, security and custodial measures; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden.

> 1. As Assistant Warden, assists in the development, establishment and implementation of rules, regulations, directives, policies and procedures of the institution to ensure proper operation of the daily functions; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden. (35%)

> 2. Plans, organizes and directs the overall Opera-

tions function and their managers, including security, physical plant operations, dietary services, inmate discipline, work camp and other miscellaneous logistical support services; coordinate[s] all inmate programs related to these functions; participates in the budget process by gathering data from department heads regarding current and anticipated programs and projects; makes recommendations to management outlining budgetary needs. (25%)

3. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels employees on problems with productivity and quality of work; determines staffing needs to achieve program goals and objectives; reviews activity reports. (15%)

4. Serves as Chairman of the Safety and Sanitation Committee; conducts routine and unscheduled safety, health, sanitation and security inspection tours throughout the institution; makes recommendations to the Warden as to any changes, problems or improvements. (10%).

5. Serves as Chairman of the Adjustment Committee; makes decisions on disciplinary problems involving infractions of the institution rules by residents; hears and resolves problems; enforces discipline. (10%).

6. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. (5 %).

And here is the description of the job of assistant warden for

programs (Snyder's job):

> Under administrative direction of the Warden . . . of Taylorville Correctional Center, plans, organizes and directs the entire Program Services for the rehabilitation and resocialization of residents at the Taylorville Correctional Center; formulates operation procedures and rehabilitation programs for areas of assignments; interprets and carries out policies of the Department of Corrections and institutional superintendent; is administratively responsible and accountable for execution of policies and procedures and management of the institution while serving as Duty Warden.
>
> 1. Plans, organizes and assumes direct responsibility over functions of academic and vocational, chaplaincy, clinical services, leisure time activities, medical and dental services; coordinates all residents programs relating to these functions. Monitors Pre-Start Program and Lifestyle Redirection Program. (30%)
>
> 2. Assists the Warden in carrying out policies, rules and regulations of the institution ensuring orderly operation of daily functions of the institution, administratively responsible and accountable for execution of policies and procedures and management of the institution while serving as Duty Warden. (25%)
>
> 3. [Identical to paragraph 3 of job description of assistant warden for operations]. (20%)
>
> 4. Speaks to lay and professional groups regarding various institutional programs; answers correspondence from the general public. (10%).
>
> 5. Conducts daily routine inspection tours of the institution including the inspection of resident's living quarters; instructs and counsels residents by holding

regular interviews by request in order to assist them with problems and confers with resident's relatives. (10%).

6. [Identical to paragraph 6 of job description of assistant warden for operations].

Note to begin with the references to "Duty Warden." The two assistant wardens are the top officials in an Illinois prison below the warden himself; there is no deputy warden. That means that when the warden is sick, on vacation, or simply off duty, one of the assistant wardens is in charge, i.e., is the "Duty Warden." Since a prison is a 24-hour-a-day, seven-day-a-week operation, the assistant wardens must be in charge much of the time, since the warden can't work anywhere near a 168-hour week.

Of course the duty warden will avoid making major, irrevocable policy decisions, but he will necessarily be exercising quite broad discretionary authority when he is standing in for the warden. Even when the warden is on duty the assistant warden is required to perform a variety of important discretionary functions that are particularly sensitive in a prison setting. Granted, paragraphs 3, 4, and 6 of the operations assistant's description, and paragraphs 3 through 6 of the programs assistant's description, could well be thought merely professional or ministerial, rather than judgmental, policy-oriented, and politically sensitive. But the remaining portions of both descriptions enumerate a variety of tasks that are judgmental, policy-oriented, and politically sensitive.

The operation of the state's prisons costs more than a billion dollars a year and is one of the major functions of Illinois state government, and, as the descriptions make clear, not all the policy judgments required for their opera-

tion can be made by the top officials in the Department of Corrections. Many of those judgments have to be made at the prison level, in recognition of differences in the size and composition of the prison population, in the location of prisons, and in the design and quality of physical plant. The state could if it wanted deprive its wardens and assistant wardens of all policy functions and run the state prison system as if it were a single prison (with more than 40,000 inmates!) with the state's Director of Corrections as the warden and two deputies of his as the assistant wardens. But it is apparent from the job descriptions that the state has not done that.

The plaintiffs rely heavily on *Kiddy-Brown v. Blagojevich*, 408 F.3d 346 (7th Cir. 2005). Among a number of issues in that case was whether the job description of warden of an Illinois state prison entitled the governor to treat the warden's job as a policymaking position. The court rejected the contention and remanded the case for further factual development. The result may seem flatly inconsistent with our analysis, especially since our plaintiffs are only assistant wardens. But the appearance is deceptive. There is no inconsistency, and we have neither cause nor inclination to intimate any criticism of the decision, which turned on a procedural point inapplicable to the present case. The only evidence in *Kiddy-Brown* was the plaintiff's affidavit in which she stated—implausibly, but that is neither here nor there—that she "had no autonomous or discretionary authority." *Id*. at 335. Since there was no other evidence, the court ruled that the defendants were not entitled to judgment so early in the litigation. They had, it is true, appended to their answer to the complaint the official description of the warden's job, which indicated that a warden indeed possesses discretionary authority. But the court did not treat the description as evidence; for no

testimony, affidavit, statutory reference, stipulation, or other ground for believing that the description *was* official, reliable, and up to date had been presented. So far as appeared, the description appended to the answer had been drafted by Governor Blagojevich in person the day before the answer was filed. Not that that was likely; but it was not a possibility excluded by the evidence.

The contrast with our cases is stark. Riley stipulated that the description of the job of assistant warden for operations that we have quoted is indeed the official description of his job. Snyder did not so stipulate, but in an affidavit acknowledged that the job description had come from the Department of Central Management Services. In their briefs in this court, Riley, notwithstanding his stipulation, and Snyder, in identical language (they have the same lawyer), complain that "the document [the job description] contains no reference to any Illinois statute." But a public document doesn't have to contain a statutory reference in order to be official. Indeed, the reference itself could not attest to the authenticity or reliability of the document but merely assist the reader in tracing its provenance. Nor did Riley purport to be withdrawing his stipulation.

We know from the numerous cases cited earlier that the job description, if reliable, is the correct basis for the court's determining whether political affiliation is a legitimate requirement of the job. But because this principle was not pressed on, or mentioned by, the court in *Kiddy-Brown*, the court treated the job description appended to the defendants' answer as a document barren of evidentiary significance, since no effort had been made to establish its authenticity, let alone its reliability. The court decided *Kiddy-Brown* as the case had been framed by the parties. The present case was properly framed in accordance with the unchallenged case law cited earlier.

Neither those cases nor our decision today stand for the proposition that every *Elrod/Branti* case can be resolved just by reading the job description. The description might leave the reader unclear whether the job confers any policy-making or confidential discretion, and then additional evidence would be necessary. Some job descriptions, perhaps, will have been altered by the elected officials not to reflect actual changes in the duties of a position but rather to enable them to fill jobs that do not involve such duties with their political favorites. Neither is a factor in the present case. The descriptions ascribe significant policymaking responsibilities to assistant wardens of Illinois state prisons and we know from the cases that the fact that particular incumbents may have been mice who forbore to exercise any of those duties is irrelevant. There is no indication that the job descriptions in the record are not official (all the indications are to the contrary) or that Governor Blagojevich or any other political official caused them to be altered, as by leaning on the members of the Civil Service Commission.

We also do not mean to suggest that official job descrip-tions are straitjackets that prevent elected officials from altering the duties of their subordinates. State law may or may not allow such an official to impose on a subordinate duties not listed in the official job description. But as a matter of federal constitutional law, if a public employee in fact exercises policymaking or confidential duties he can be fired on the basis of his political affiliation; he may have remedies under state law but his federal constitutional rights will not have been violated.

The significance of the official job description in a case like this is thus as a provisional safe harbor for elected officials. If the official job description is objective, as shown by the

methods by which it is created, vetted, and updated to the present, then the elected officials can rely on it in deciding whom they can replace on political grounds.

Riley and Snyder also claimed that their dismissal was wrongful retaliation for their exercise of free speech and a deprivation of property without due process of law. But the first claim is merely a restatement of their claim that political affiliation is a forbidden criterion for an assistant warden's job, and a due process claim identical to theirs was correctly rejected in *Kiddy-Brown*.

We therefore reverse No. 04-3085 and affirm No. 04-3436.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*