Sheryl ALBERS–ANDERS, Plaintiff,

v.

Mark POCAN, Defendant.

No. 11–cv–392–bbc.

United States District Court,
W.D. Wisconsin.

Sept. 24, 2012.

Andrea Joyce Farrell, Jeff Scott Olson, Jeff Scott Olson Law Firm, Madison, WI, for Plaintiff.

Richard Briles Moriarty, Wisconsin Department of Justice, Madison, WI, for Defendant.

## OPINION AND ORDER

BARBARA B. CRABB, District Judge.

Plaintiff Sheryl Albers–Anders served in the Wisconsin Assembly as a Republican from 1991–2009. After leaving the assembly, she applied for employment as the committee clerk for the Joint Finance Committee. When defendant Mark Pocan, a Democratic representative, chose not to hire her for the position, she brought this action, contending that he had violated her rights under the First Amendment by choosing not to hire her because she was a Republican. Defendant denies that plaintiff's particular party affiliation was relevant to his decision. Rather, he contends, he chose not to hire plaintiff because the position required political neutrality and he believed that her history of partisan political activity would diminish her effectiveness in the job.

Early in the case, defendant filed a motion for summary judgment on the sole ground of qualified immunity, together with a motion for a protective order limiting discovery. The second of these motions was granted on March 29, 2012. Discovery and briefing were restricted to the question "whether the 'inherent duties' of the clerk for the Joint Committee on Finance make it inappropriate ... to place restrictions on publicly known political affiliation or past political activities when hiring for the position, and if so, whether a reasonable legislator in defendant's shoes should have known that the law was against him." The purpose of this early summary judgment motion was to resolve the dispute about the nature of the job and, if possible, avoid extensive discovery into defendant's hiring process.

The early motion was not entirely successful. The undisputed facts show that an applicant's history of partisan political activities is a legitimate employment consideration for the committee clerk position, but it remains to be determined whether defendant rejected plaintiff's application because of her past political activities or because she was a Republican.

Several procedural matters require discussion at the outset. One is the manual describing the clerk's responsibilities, which is relevant to determining the nature of the job and specifically whether a history of political partisanship would be a legitimate reason for not hiring a particular applicant. This manual is the only written material describing the job; no official job description exists.

When defendant filed his motion to dismiss on May 31, 2011 and again when he filed his proposed findings on fact on December 7, 2100, he filed a 38–page document he referred to as the clerk's manual. On April 26, 2012, after 10 months of litigation and just 12 days before plaintiff's responses to the proposed findings of fact were due, defendant filed a 133–page

"committee clerk manual," attested to by Glenn Wavrunek, a legislative aide to defendant. Wavrunek Aff., dkt. # 46. Wavrunek averred that the 133–page version was the correct one.

Not surprisingly, plaintiff responded with a motion to "disregard new facts introduced for the first time in reply." The title is not accurate; defendant filed the new version of the manual in conjunction with his opening brief, not his reply brief, but plaintiff's point is valid. Introducing an entirely new piece of evidence at this time was inconsiderate, if not improper.

With his reply, defendant filed the affidavit of a paralegal, Sally Mueller, in which she says she mistakenly included only 38 pages of the manual in the first filing and failed to include "the remaining 28 pages." Mueller Aff., dkt. # 55. This explanation accounts for 66 pages, not for 133 pages and leaves a number of questions. The issue becomes more complex upon examination of the 133–page version, which does not include all of the material in the 38–page version. Defendant did not identify or explain the substantive differences between the two versions.

Plaintiff says that the dispute over the applicable version creates a material issue of fact requiring a trial, but she has identified any differences between the materials that would create a genuine issue of fact about the nature of the clerk's job duties. In deciding defendant's motion, I will rely on the 38–page version as the official manual.

In the same "motion to disregard," plaintiff objects to what she calls defendant's introduction of new facts in his reply. She says that defendant introduced new facts about his expert Brian Anderson, but she does not say what these are, so it is not necessary to take up her objection. In any event, I am not relying on any of Anderson's opinions.

In the motion plaintiff responds to several procedural objections that defendant raised in his summary judgment filings. For instance, defendant objected to plaintiff's citation to an unsigned copy of his answers to plaintiff's interrogatories, instead of citing the signed original that he served on plaintiff. Def.'s Resp. to Plt.'s PFOF 155–56, 173–88, 203, and 208–10, dkt. # 54; Def.'s Reply Br., dkt. # 53, 19–20. However, plaintiff's counsel filed an affidavit averring that the cited copy was accurate and defendant does not say that the content of the copy differed from that of the signed original. Accordingly, I will overrule defendant's objection and deny plaintiff's motion as moot. The remainder of plaintiff's motion addresses irrelevant disputes about the timing of the discovery responses and will be denied as unnecessary.

From the parties' proposed findings of fact, I find that the following facts are relevant and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Sheryl Albers–Anders is a former member of the Wisconsin Assembly. Defendant Mark Pocan represents the 78th District of the Wisconsin Assembly, a position he has held since January 1999. From January 2005 until January 2011, defendant was a member of the Joint Committee on Finance; he served as its co-chair from January 2009 until January 2011. In the fall of 2009, after plaintiff left the assembly, she applied for an open position as the committee clerk for the Joint Committee on Finance. Defendant denied her application.

### B. *The Joint Committee on Finance*

The Joint Committee on Finance is a standing committee of the Wisconsin Legislature composed of members of the Wis-

consin Assembly and Senate. It is the principal legislative committee with oversight of Wisconsin's appropriations and revenues. The committee reviews the governor's biennial budget proposal and all revenue items in spending bills. Wis. Stat. § 13.093(1). It also has specific authority to review a number of bills and programs, such as programs started with federal aid, Wis. Stat. § 13.095; bills proposing revocation of operating privileges, Wis. Stat. § 13.0965; bills affecting housing, Wis. Stat. § 13.099; and appropriation and position changes, Wis. Stat. § 13.101. In addition, the committee serves as an ongoing fiscal supervisor for state agencies, with authority over more than 100 distinct areas. Wisconsin agencies make more than 100 different statutorily required reports to the committee. At an agency's request, the committee may change the number of the agency's authorized positions funded by segregated or general revenue. The committee also serves as an emergency appropriations board, with the authority to supplement agency appropriations for emergency purposes and to transfer funds between programs. Wis. Stat. § 16.515.

The committee's authority and many of its procedures derive from various Wisconsin statutes, which often contain cross-references to federal requirements. Accordingly, the committee requires sound procedures and record-keeping to insure that it can meet its various deadlines. Action or inaction by the committee affects Wisconsin's fiscal situation. If the committee fails to act within its set deadlines, policy proposals cannot be implemented and major sources of revenue from the federal government may be lost.

Since January 1999, the committee has consisted of eight senators and eight representatives. The majority party in the assembly is the source of six members and the minority party supplies two members. The Speaker of the assembly appoints the members from the assembly, although by tradition the Speaker adopts the recommendations of the party leadership. One senator and one representative serve as co-chairs of the committee and alternate responsibility for presiding at the committee's hearings.

When the Democratic party gained the majority in the assembly in January 2009, defendant became the assembly co-chair of the Joint Committee on Finance. At that time, the committee also added five new members from the assembly. Defendant remained co-chair until January 2011, when the Republican party regained the majority and he decided not to seek reappointment to the committee. The committee added five new assembly members in 2011. The assembly membership on the committee has changed between every one of the 51 legislative sessions since the committee's creation in 1911.

## C. The Assembly Committee Clerk Position

Both the senate and assembly maintain a "committee clerk" for the Joint Committee on Finance. Previously, the responsibility for the committee hearings alternated between the clerks for the senate and assembly. Since January 2009, however, the assembly clerk has been responsible for all of the committee's hearings. Indeed, the website for the Wisconsin Legislative Fiscal Bureau now identifies the assembly committee clerk as the committee clerk for the Joint Committee on Finance, so I will refer to the assembly committee clerk as "the committee clerk."

The committee clerk is assigned to the staff of the assembly co-chair of the Joint Committee on Finance. Since 2005, the assembly committee clerk has remained in the position even when the assembly co-chair changes and been reassigned to the staff of the new co-chair. (The senate committee clerk continues to change when

the senate co-chair changes). Maintaining the continuity of the clerk has provided stability and professional organization for the committee's activities.

Diane Harmelick served as the committee clerk from 2003 to 2009, despite changes in the Assembly co-chair. (During her tenure, Harmelink prepared a "Committee Clerk Manual," which was later amended by her successors.) In the fall of 2008, Harmelink announced that she was retiring as the committee clerk.

As the incoming assembly co-chair, defendant was responsible for selecting Harmelink's replacement. Defendant proposed, and the incoming senate co-chair agreed, that after Harmelink retired the assembly committee clerk would be responsible for all the committee's hearings. Since January 2009, the assembly committee clerk has functioned as the main clerk of the Joint Committee on Finance, with the senate clerk functioning as the backup. This practice continued past January 2011, when the Republicans regained a majority in the assembly.

In early December 2008, defendant chose Char Vrieze for the committee clerk position. The following summer, Vrieze informed defendant that she would be leaving the position. Defendant asked the Chief Clerk of the assembly to inform potential interested parties of the opening, which the clerk did by distributing an e-mail to the offices of all members of the legislature, among other potentially interested entities.

Plaintiff applied for the committee clerk position, but defendant offered the position to Joseph Malkasian, who had worked for a year as the assistant clerk in the Assembly Chief Clerk's Office and four years as a messenger assigned to the Joint Committee on Finance. When Malkasian became committee clerk, he was assigned to defendant's staff. Since January 2011, when Republicans regained control of the assembly, Representative Robin Vos has been the assembly co-chair of the Joint Committee on Finance and Malkasian has been assigned to his staff.

### D. *The Assembly Committee Clerk's Responsibilities*

Unlike other members of the staff of the Joint Committee on Finance co-chair, the committee clerk does not exercise any influence on votes, make policy suggestions or participate in substantive negotiations. Instead, the committee clerk performs administrative tasks that help make sure that the Joint Committee on Finance and its hearings run smoothly. Before hearings, the committee clerk maintains and distributes the agenda and the list of speakers, creates and distributes meeting notices and drafts the meeting script. During hearings, the clerk assists the co-chairs in calling on speakers in the proper order, records all the votes and handles various other administrative tasks. When the assembly co-chair presides over hearings of the Joint Committee on Finance, the committee clerk sits next to the co-chair and frequently consults with the co-chair. After meetings, the committee clerk reports the bill out of committee, insures that the bill jacket (a file containing legislative history materials) is sent to the appropriate office and reviews the draft of the meeting minutes before they are signed by the presiding co-chair.

The committee clerk also keeps track of the committee's business and sees to it that committee members and other legislators are informed of its progress. For example, the committee maintains a "passive review" approval procedure for supplemental appropriations for program revenue. Wis. Stat § 16.515. Review requests are submitted to the committee and, unless a members or other legislator objects after a certain amount of time, the requests are approved. The committee clerk maintains the spreadsheet to track all pending pas-

sive review requests. He or she makes sure that a copy of the request is delivered to committee members and any legislator whose area is affected by the request. If no one objects to the request, the clerk writes an approval letter for co-chairs' signatures, gets the co-chairs' signatures and distributes copies of the signed approval letter to legislators, staff and agency officials. The clerk manages similar tracking and distributing procedures for bills referred to the committee and for letters from the governor about planned uses of federal stimulus funds.

Although the committee clerk's tasks are routine, they are not trivial. Many of the committee's procedures are required by Wisconsin and federal statutes or administrative codes. A mistake by the committee clerk could cause the State of Wisconsin to lose millions of dollars of revenue or violate state law.

### E. *Nonpartisan Legislative Services*

State and federal legislators rely on nonpartisan legislative services agencies for budgetary analysis, policy analysis and drafting assistance. For example, the Congressional Budget Office, the White House Office of Management and Budget and the Office of Legislative Counsel of the Senate are nonpartisan federal agencies that supply advice to executive and legislative officials. Five legislative services agencies in Wisconsin are required by statute to perform services in strictly non-partisan manner, including the Legislative Fiscal Bureau, the Legislative Reference Bureau, the Legislative Council, the Legislative Audit Bureau and the Legislative Technology Services Bureau. Wis. Stat. §§ 13.91, 13.92, 13.94, 13.95 and 13.96. The Congressional Budget Office, the White House Office of Management and Budget and the Office of Legislative Counsel of the Senate announce publicly that they prefer applicants without a history of partisan activities. Many of the state

counterparts for these agencies maintain similar requirements in job descriptions and postings.

### OPINION

#### A. *Qualified Immunity*

Defendant has moved for summary judgment on his qualified immunity defense. As the party suing a government official, plaintiff has the burden to show that (1) the defendant's actions violated the plaintiff's federal rights and (2) those rights were clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Although the plaintiff has the ultimate burden of showing that qualified immunity does not apply, at summary judgment the defendant must show that the plaintiff cannot prove either that the defendant took any act that violated the plaintiff's federal rights or that a reasonable public official in the defendant's position would have known that his actions violated plaintiff's rights at the time he took them. *Kerr v. Farrey,* 95 F.3d 472, 480 (7th Cir.1996) (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Defendant contends that plaintiff cannot meet either prong of that showing.

#### B. *Violation of Plaintiff's Constitutional Rights*

■ The First Amendment prohibits government employers from hiring or firing employees on the basis of protected First Amendment speech or association. *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). However, an employer may consider an applicant's political affiliation when affiliation is an "appropriate requirement" because "the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access

to his political superiors' confidential, politically sensitive thoughts." *Riley v. Blagojevich,* 425 F.3d 357, 359 (7th Cir.2005) (summarizing development of *Branti* line of cases). To determine whether the position involves the exercise of political discretion or confidentiality, courts apply "a functional test that examines the powers and duties inherent in the position." *Carlson v. Gorecki,* 374 F.3d 461, 464 (7th Cir.2004).

To help public employers make employment decisions without fear of burdensome litigation, the Court of Appeals for the Seventh Circuit has instructed the district courts to rely on the position's job description to determine its "inherent duties," unless the description is unreliable. *Riley,* 425 F.3d at 360. In this case, no job description exists for the committee clerk position so the court must consider instead "both the historical treatment of the position and the actual work performed by the people who hold the position." *Carlson,* 374 F.3d at 465. In doing that, I have relied on the undisputed elements of the committee clerk manual and other undisputed evidence of the clerk's job responsibilities.

Defendant has disavowed any claim that the committee clerk position qualifies for the policy-making exception to the First Amendment protections afforded public employees because the clerk exercises political discretion or judgment. Def.'s Resp. to Interrog. # 1–3, dkt. # 51–1; Def.'s Br. in Supp., dkt. # 32, at 19. This concession was appropriate. The clerk performs primarily administrative duties and does not have a voice in the committee's or the co-chair's policy decisions. *Riley,* 425 F.3d at 360 (explaining that policymaker exception does not apply to "employees who have merely ministerial duties—who really have very little discretion—and employees whose discretion is channeled by professional rather than political norms").

Defendant does argue that he was entitled to consider plaintiff's affiliation (and her partisan activities), because other legislators associate the co-chair with the clerk, who is a member of the co-chair's staff and sits next to him at hearings. Defendant's arguments on this front are unpersuasive, particularly because the clerk sits next to every co-chair, whatever the co-chair's political affiliation. Moreover, the cases defendant cites are not on point. For instance, he cites *Gordon v. Griffith,* 88 F.Supp.2d 38, 40–41 (E.D.N.Y. 2000), in which a legislator terminated his "community relations director" for making comments during a rally against alleged police brutality that angered police officers. The court held that the legislator could discharge the plaintiff for her speech, because his constituents would reasonably believe her comments represented his views. *Id.* at 66–68. See also *Shulski–Matthew v. McGill,* 2005 WL 3508626, *1–2, 2005 U.S. Dist. LEXIS 34615, *2–3 (E.D.Pa. Dec. 21, 2005) (state legislator entitled to qualified immunity for firing assistant who campaigned for candidate he did not support, because assistant dealt with constituent concerns and could reasonably be viewed as his "conduit to the public"). In contrast to the employees in the cited cases, the committee clerk does not represent the co-chair in public or play any role in constituent relations. The mere fact that the clerk's performance of administrative duties reflects on the co-chair is not sufficient to place the clerk outside the protection of the First Amendment.

Defendant's primary argument relies on a new twist on the *Branti* doctrine. He contends that it was appropriate for him not to choose plaintiff because of her well-known history of partisan political activity (rather than her Republic affiliation specifically), because the committee clerk is re-

quired to appear to be politically neutral. Although the question of defendant's actual intent is beyond the scope of defendant's summary judgment motion, I can resolve the question regarding the status of the committee clerk position for First Amendment purposes.

 The parties have not cited any cases holding that a public employer may choose not to hire a particular applicant for a nonpartisan position because of the applicant's history of partisan political activity. Nevertheless, this is an appropriate exception to the general rule that public employers may not make employment decisions on the basis of protected First Amendment activities. Public employers may discharge policymakers or confidential employees for otherwise protected activities because of the government's compelling interest in assuring that elected officials have politically loyal staff to help them represent their constituents and to achieve their electoral mandate. *Nekolny v. Painter*, 653 F.2d 1164, 1169–70 (7th Cir.1981). Similarly, the government may prohibit civil service employees from engaging in partisan political activities during their employment, in part because of its compelling interest in maintaining a neutral civil service and the appearance of neutrality. *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 565–66, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Paulos v. Breier*, 507 F.2d 1383, 1386 (7th Cir.1974) (police department's need to appear nonpartisan outweighed detective's interest in sending political endorsements to patrolmen). If a government employer can ban partisan activities during employment in a nonpartisan civil service position, then surely such an employer may consider a job applicant's history of partisan activity.

In particular, legislative services agencies such as budget agencies need to main-

tain a reputation for non-partisanship if they are to provide legislators of both parties reliable analysis for sound decisions. *Keeffe v. Library of Congress*, 777 F.2d 1573, 1579–81 (D.C.Cir.1985) (holding Library of Congress may prohibit analysts for Congressional Research Service from attending political conventions). For such positions, a substantial history of partisan advocacy may be an indication that an applicant may be unable to set aside her partisan tendencies and perform reliable, objective analysis. Moreover, if agencies hire well-known party activists, they may create the impression that their analysis is politically biased. Accordingly, state and federal legislative services agencies commonly and appropriately note in their job postings and descriptions that applicants should not have a strong history of partisan advocacy.

Nonpartisanship is not a requirement of the committee clerk position, and the clerk does not work for a non-partisan agency or perform nonpartisan budgetary or policy analysis. Nevertheless, given the nature of the clerk's responsibilities, a decision maker could reasonably consider an applicant's history of partisan activity. The committee clerk needs to be nonpartisan and maintain a reputation for being nonpartisan, because the clerk must work closely with committee members from both political parties and co-chairs from both parties. In addition, the clerk's management responsibilities place him or her in a substantial position of trust in which there are ample opportunities for partisan manipulation, particularly given the committee's procedures. For example, a partisan clerk could manipulate the passive approval process by not making efforts to notify committee members from the other party in time for them to oppose the appropriations.

Plaintiff has not addressed defendant's argument for this new exception or defen-

dant's argument that the clerk position fits under the new exception. Instead, plaintiff assumes there is no distinction between considering an applicant's political affiliation and considering the applicant's history of partisan activities. She devotes the majority of her response brief to arguing that it is clearly established that a public employer cannot discriminate on the basis of protected activities. However, these two considerations are distinct. In light of the undisputed facts, I conclude as a matter of law that it would be appropriate for a decision maker to consider an applicant's history of partisan political activity when selecting among applicants for the committee clerk position.

■ However, I cannot infer from this conclusion that defendant did not violate plaintiff's First Amendment rights, because I cannot determine at this time whether defendant chose not to hire plaintiff because of her partisan history or he made the decision because of her Republican affiliation. When the government is entitled to restrict speech in facially neutral manner or to restrict categories of speech, those restrictions must be applied in a viewpoint neutral fashion. *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). For example, a city can restrict the location of public protests, but cannot enforce that restriction against anti-abortion advocates and not against pro-choice supporters. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (holding that ban on any peaceful picketing except labor picketing violated equal protection). Similarly, a public employer can prohibit its employees from attending partisan political rallies, but cannot punish employees who attend Republican rallies and not those who attend Democratic rallies. Cf. *National Association of Letter Carriers*, 413 U.S. at 564, 93 S.Ct. 2880 (in

upholding Hatch Act, noting that "[t]he restrictions so far imposed on federal employees are not aimed at particular parties, groups, or points of view, but apply equally to all partisan activities of the type described"). Accordingly, plaintiff can still prove that defendant violated her constitutional rights under the First Amendment if she proves that he chose not to hire her because she was a Republican.

## C. *Clearly Established Right*

Defendant argues that he is entitled to qualified immunity because it is not clearly established that a legislator violates a job applicant's First Amendment rights by choosing not to hire her on the basis of her history of partisan political activity. I cannot rule on this argument at this time because there remains a dispute about why defendant chose not to hire plaintiff. To accommodate defendant's request to limit discovery while resolving his summary judgment motion, I entered an order placing any issues about defendant's hiring process and intent outside the scope of the summary judgment motion and I disregarded defendant's proposed finding of fact that concerned only his hiring process and motivations. Def.'s PFOF ## 27, 34, 36, 37 and 38, dkt. # 44.

If defendant chose not to hire plaintiff because of her Republican affiliation, then he violated her clearly established rights. *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). If he chose not to hire her because of her history of partisan political activity, he did not violate her rights.

This last issue will have to be decided at trial, after plaintiff has had an opportunity to conduct discovery into defendant's hiring process. I anticipate that no further round of summary judgment will be necessary because the dispositive issue is one of fact about defendant's intent. Accordingly, a scheduling conference will be held by telephone on September 26, 2012 at 9:00

a.m. to set the case for trial as promptly as possible.

ORDER

IT IS ORDERED that

1. Plaintiff Sheryl Albers–Anders's motion to "disregard new facts in reply and unwarranted objections," dkt. # 57, is DENIED as moot.

2. Defendant Mark Pocan's motion for summary judgment on the basis of qualified immunity, dkt. # 25, is DENIED.

3. As a matter of law, it is determined that plaintiff's history of partisan political activities was an appropriate employment consideration for the committee clerk position; her party affiliation was not.

4. A scheduling conference will be held by telephone on September 26, 2012 at 9:00 a.m. Defendant's counsel is responsible for initiating the conference call to chambers.

5. The protective order governing discovery, dkt. # 44, is LIFTED.