Scudder, Circuit Judge.
*212 Nicole Bogart, a Democrat, worked as the Financial Resources Director of Vermilion County, Illinois, but her tenure ended when Michael Marron, a Republican, assumed control of the County Board and fired her. She responded by bringing claims under the First Amendment and Equal Protection Clause, alleging that Vermilion County and Marron violated her right of political affiliation and engaged in political retaliation. The district court dismissed the equal protection claim as duplicative of the First Amendment claim, and, after finding that the substantial fiscal and budgetary responsibilities of Bogart's position fit within the Elrod - Branti exception to political patronage dismissals, granted summary judgment for the defendants on her First Amendment claim. We affirm.
I
In July 2007 Vermilion County hired Bogart as its Financial Resources Director. Bogart, herself a Democrat, replaced the prior Financial Resources Director who had ties to the Republican Party and was fired shortly after a Democrat ousted the then-Republican Board Chairman in 2006.
At the time it hired Bogart, the County had in place a written description of responsibilities of the Financial Resources Director. The description explained that the Director "[r]eports to and performs work at the direction of the County Board Chairman and assists the Finance Committee in their meetings and ensures that information about the County's finances is available to board members," "[d]evelops both long and short-range financial plans involving revenue and expenditure projects," "[c]onducts budget preparation, review, and control," and "[e]xercises on-going budget analysis by tracking expenditures and reviewing requests for line item transfers." In her deposition testimony, Bogart confirmed that she performed many of the responsibilities delineated in the written job description.
In 2012 several Republican candidates won election to the County Board, giving Republicans majority control and thus the power to select the Chairman for the first time during Bogart's tenure. The newly-selected Republican Chairman, Gary Weinard, served from 2012 to 2014. At the outset of his tenure, Weinard asked Bogart to prepare a description of her responsibilities as the Financial Resources Director. Several of the responsibilities she listed in her written response mirrored those in the County's formal job description. For example, Bogart wrote that she "[c]onducts budget preparation, review and control," "[p]repares the fiscal year budget for public review and adoption," "[c]reates 23 of the County's 109 budgets and monitors them monthly," "[a]nalyzes all 109 budgets and communicates concerns, changes and historical data to Chairman of the Board, Chairman of the Finance Committee and Auditor," and "[s]crutinizes expenditures, [and] continually seeks out savings and revenue opportunities."
According to Bogart, several Republican Board members urged Weinard to fire her because she was a Democrat. Weinard never did so. In December 2014, however, Weinard resigned and Michael Marron, a Republican, became Chairman. Within a month, Marron fired Bogart.
Bogart responded by bringing suit under 42 U.S.C. § 1983 against Marron and Vermilion County. She alleged that defendants' firing her constituted political retaliation and discrimination in violation of the First Amendment and Equal Protection Clause.
The district court dismissed Bogart's equal protection claim as duplicative of her *213 First Amendment claim. At the close of discovery, the district court then granted Vermilion County and Marron's motion for summary judgment on Bogart's First Amendment claim, reasoning that her job as the County's Financial Resources Director entailed substantial policymaking authority and discretion and thus fit within the exception to the First Amendment's general ban on political patronage dismissals. Bogart now appeals those determinations.
II
A
In two companion cases, the Supreme Court held that, while public employers cannot condition employment on an individual's political affiliation, an employee's First Amendment right of political association leaves room for employers to dismiss employees in positions where political loyalty is a valid job qualification. See Elrod v. Burns , 427 U.S. 347, 372, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ; Branti v. Finkel , 445 U.S. 507, 516, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). And so emerged the so-called Elrod - Branti exception to political patronage dismissals. The Federal Reporter contains many illustrations of how this exception applies (or not) to particular dismissals. See, e.g. , Embry v. City of Calumet City , 701 F.3d 231 (7th Cir. 2012) ; Allen v. Martin , 460 F.3d 939 (7th Cir. 2006) ; Riley v. Blagojevich , 425 F.3d 357 (7th Cir. 2005) ; Garcia v. Kankakee Cnty. Housing Authority , 279 F.3d 532 (7th Cir. 2002) ; Tomczak v. City of Chicago , 765 F.2d 633 (7th Cir. 1985). This precedent supplies the controlling framework here.
The overarching inquiry under the Elrod - Branti exception is whether the public employer can show that "party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti , 445 U.S. at 518, 100 S.Ct. 1287 ; see also Elrod , 427 U.S. at 367, 96 S.Ct. 2673 (explaining that patronage dismissals may help ensure "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, polices presumably sanctioned by the electorate"). "[T]his could be either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts." Riley , 425 F.3d at 359 (citing Elrod , 427 U.S. at 367-68, 96 S.Ct. 2673 and Branti , 445 U.S. at 518, 100 S.Ct. 1287 ).
Our focus, then, is on whether the job in question entails substantial policymaking responsibility, meaningful discretion to implement the policy goals of elected officials, or a need to maintain the confidentiality essential to enabling robust deliberations entailing disagreement and incorporating political objectives. See Allen , 460 F.3d at 944 ; Embry , 701 F.3d at 235-36.
Determining whether a particular job fits within the Elrod - Branti exception can lead to "excessive litigation in the turnover between opposing political administrations," and further, may encourage "incumbent public employees [to] protect[ ] their jobs by simply neglecting particular responsibilities." Allen , 460 F.3d at 944 (citing Riley , 425 F.3d at 361 ). To mitigate these risks, we "focus on the inherent powers of the office as presented in the official job description," while also looking at "how the description was created and when, and how often, it was updated." Id .
Indeed, unless the plaintiff demonstrates that the job description bears *214 "some systematic unreliability" or "has been manipulated in some manner by officials looking to expand their political power," our examination begins and ends there. Id . This approach enables incoming political leaders to determine, without the need for a protracted inquiry, which jobs they may validly treat as partisan positions. See Riley , 425 F.3d at 360-61 ; see also Tomczak , 765 F.2d at 641 (endorsing the same approach on the basis of efficiency and predictability).
B
These principles find straightforward application on the record before us. The district court rightly concluded that Bogart's job description-both the formal one in effect when she took the job in 2007 and the updated one she prepared in 2012-reliably described her responsibilities as Financial Resources Director. Bogart, too, confirmed as much during her deposition testimony, agreeing that the job description in place in 2007 accurately captured many of her key responsibilities, including reporting directly to the County Chairman, helping to keep Board members informed about the County's finances, developing long- and short-range financial plans for the County, and assisting with the preparation and review of the County's annual budget. At no point in her testimony did Bogart contend that either the 2007 or 2012 job descriptions were meaningfully inaccurate or incomplete.
Bogart held a senior position requiring the trust and confidence of the elected Board members, including the County Chairman, and entailing substantial policymaking authority. Budgeting decisions often are to municipal government what matters of foreign policy are at the national level. What projects and programs receive funding and in what amounts, what revenue needs will be in future years, and how best to manage unexpected financial contingencies are important matters having a substantial effect on the quality of life in local communities. Board candidates run on how they plan to address such matters, and, once elected, municipal leaders need skilled and trusted confidants to help make and implement these difficult fiscal decisions.
Bogart's position as Financial Resources Director was such a position. It was effectively a cabinet-level position in Vermilion County. No more is required to fit within the Elrod - Branti exception. See Allen , 460 F.3d at 941 (explaining that the Elrod - Branti exception applied to a position responsible for "planning, organizing, and directing accounting activities department-wide, establishing fiscal control procedures, administering all business services and keeping management informed of potential problems in expenditures or fiscal agreements"); see also Nader v. Blair , 549 F.3d 953, 960 (4th Cir. 2008) (explaining that the Elrod - Branti exception applied to a position responsible for preparation and oversight of the county budget because "such decisions may be quite personal and contentious"). On this record, the district court properly concluded that Vermilion County could terminate Bogart without offending the First Amendment.
C
Alongside her First Amendment claim, Bogart advanced a separate claim under the Equal Protection Clause, which the district court dismissed as duplicative. The district court may have painted with too broad a brush, for we are not prepared to hold that any and all allegations of discrimination on the basis of political affiliation would fail to state a claim under the Equal Protection Clause.
But this case does not require us to define the full parameters or potential application of the Equal Protection Clause to claims of political discrimination. What the district court faced here was an equal protection *215 claim that exactly mirrored Bogart's First Amendment claim. So even if the district court erred in dismissing Bogart's equal protection claim, there was no error in its more general observation that the claim must fail because the same considerations and evidence that defeat her First Amendment claim cause the same claim repackaged under the Equal Protection Clause to fail. See Muscarello v. Ogle Cnty. Bd. of Comm'rs , 610 F.3d 416, 422-23 (7th Cir. 2010) (endorsing the same reasoning in the context of parallel takings and equal protection claims). We cannot identify any good reason, at least on the facts presented here, to employ different standards under the First Amendment than the Equal Protection Clause in evaluating a challenge to a political patronage dismissal.
Finally, Bogart contends the district court should have ex-tended her leave to amend her equal protection claim. To the extent this argument was not waived, the district court did not abuse its discretion when it did not permit her to replead this claim.
For these reasons, we AFFIRM.