In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2589

LARRY DAVIS,

*Plaintiff-Appellant,*

*v.*

KRIS OCKOMON, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 08-cv-270—**William T. Lawrence**, *Judge.*

ARGUED OCTOBER 20, 2011—DECIDED FEBRUARY 3, 2012

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Larry Davis was terminated from his position as Senior Humane Officer ("SHO") for the City of Anderson after refusing to support the successful mayoral campaign of Kris Ockomon. Davis brought suit in district court, claiming that the position of SHO was not subject to political termination and that his dismissal violated the First and Fourteenth Amendments. The district court, relying on an official

job description, found that the SHO was a policymaking position, and therefore Davis could be dismissed for political reasons. We affirm on the basis that City ordinances authorized the SHO to exercise policymaking discretion.

## I. BACKGROUND

Davis was appointed SHO for the City in 1988, following his work on the successful campaign of Democratic mayoral candidate Mark Lawler. The SHO is the department head of the City's animal shelter and animal control operations, working with the Board of Public Safety to implement and enforce animal control policies. Davis was not initially interested in becoming SHO, and had instead requested to be placed in a number of other positions in the Lawler administration. But all of the positions he had hoped for were awarded to other individuals, and he was instead offered the job of SHO. Despite having no relevant prior experience in animal control, Davis accepted. Davis's appointment meant the ouster of the incumbent SHO, Pam Marshall. Marshall subsequently filed suit against the City, arguing that the she could not be replaced on the basis of political affiliation. The suit was settled out of court, and thus Davis secured his employment.

Davis held his position as SHO with relative job security throughout Lawler's tenure as mayor, which lasted through 2003. Nevertheless, Davis sought assurances from various City officials that he could not be replaced for political reasons, lest he suffer a similar

fate as his predecessor. After Lawler decided not to seek reelection, Kevin Smith, a Republican, was elected mayor. Smith took office on January 1, 2004, and promptly replaced many Democratic officials with members from his own party. But he did not replace Davis, ostensibly because he thought that the SHO could not be terminated for political reasons. As such, Davis remained SHO throughout Smith's tenure as mayor as well, and Davis felt the security of his position was no longer in question.

Davis's trouble began during the 2007 Democratic primary election for mayor, when Darryl Rensil ran against Kris Ockomon. Davis actively supported Rensil's campaign, but much to Davis's chagrin, Ockomon won the primary. Following his victory, Ockomon reached out to Davis in an attempt to garner his support for the upcoming general election. Davis refused, however, purportedly because he thought Ockomon had not lived in the City long enough to satisfy the residency requirement to become mayor. Nevertheless, Ockomon emerged victorious in the general election. Having incurred Ockomon's political wrath, Davis was terminated as soon as Ockomon took office on January 1, 2008. Ockomon replaced Davis with Larry Russell, who was as equally unqualified for the position as Davis had been when he was appointed in 1988.

On February 29, 2008, Davis brought suit against Ockomon and other City officials in the United States District Court for the Southern District of Indiana. Pursuant to 42 U.S.C. § 1983, Davis claimed that he was terminated from his position in violation of the First and

Fourteenth Amendments. On December 11, 2009, the district court granted the City officials' motion for summary judgment regarding Davis's § 1983 claim, and dismissed without prejudice a separate state-law claim also brought by Davis. Applying *Riley v. Blagojevich*, 425 F.3d 357 (7th Cir. 2005), the district court first determined that the official job description controlled the analysis of whether Davis could be replaced for political reasons because the job description was reliable. The district court found the job description reliable because it had been created by an independent consulting firm using nationally recognized standards and practices. The description was also kept current through three updates. Moreover, the job description had not been modified since 2000, and thus there was no evidence that any City official had tinkered with it in a way to render the description systematically unreliable.

The district court then examined whether the SHO's duties, as provided for in the job description, could be characterized as policymaking and thus properly subject to removal on the basis of political affiliation. The job description included a number of duties involving significant discretionary authority, including: preparing, submitting, and administering the department budget; formulating and implementing long-range plans for animal control; presenting policy and program initiatives; and negotiating contracts for animal control services. Due to the broad discretion exercised by the SHO, the district court found that Davis was a policymaker, and that therefore his termination was proper.

On appeal, Davis argues that the district court erred in granting summary judgment because the job description relied on by the court was systematically unreliable. Furthermore, Davis asserts that the SHO does not exercise sufficient discretionary authority to be considered a policymaker.

## II. ANALYSIS

We review the grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The City officials concede that Davis was terminated for political reasons, and thus the only issue on appeal is whether the SHO is a position subject to political termination. The First Amendment "forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990). After a plaintiff demonstrates that he was terminated for political reasons, the government then "bears the burden of establishing that a plaintiff's position falls within the exception to the general prohibition on patronage dismissal." *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 354 (7th Cir. 2005).

An individual may be terminated on the basis of political affiliation when the nature of the public official's job makes political loyalty a valid qualification for the effective performance of his position. *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). Generally, political loyalty may be a valid qualification for one of two reasons: either because "the job involves the making of policy and thus the exercise of political judgment" or it is a job that "gives the holder access to his political superiors' confidential, politically sensitive thoughts." *Riley*, 425 F.3d at 359. Although the Supreme Court in *Branti v. Finkel*, 445 U.S. 507 (1980), abandoned the labels of "policymaker" and "confidential employee" for a more functional analysis in political-discharge cases, we have found that "the terms 'policymaking' and 'confidential' do accurately describe the vast majority of offices that fall within the realm of legitimate patronage under the *Branti* formulation." *Kiddy-Brown*, 408 F.3d at 355 (internal quotation marks and punctuation omitted).

A public official is considered a policymaker where "the position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Id.* Moreover, "[a]n employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position." *Elrod v. Burns*, 427 U.S. 347, 368 (1976).

We have previously recognized that it is often difficult to determine whether an individual has policymaking

responsibilities. *See, e.g., Kiddy-Brown*, 408 F.3d at 355 ("From this court's cases, it is clear that the question whether an employee has policymaking powers in many cases presents a difficult factual question." (internal quotation marks omitted)). Almost all jobs in government require individuals to exercise at least some level of discretion, resulting in somewhat arbitrary line-drawing based on how much discretion is authorized. *Riley*, 425 F.3d at 359. Also, positions requiring the exercise of professional rather than political discretion do not properly fall within the policymaker exception; this too may be a blurry line because an official may be tasked with exercising "both professional and broader policy responsibilities." *Id.* at 360. Thus, both the amount and type of discretion authorized are relevant.

In determining whether a government official is a policymaker, we examine "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Kiddy-Brown*, 408 F.3d at 355. Focusing the inquiry on the inherent powers of an office provides greater certainty to litigants and relieves courts "of the burden of having to re-examine a certain position every time a new administration changes the mix of responsibilities bestowed upon the officeholder." *Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir. 1985). In *Riley*, we held that elected officials may rely on official job descriptions to determine the inherent powers of a given office and whether these duties render political loyalty appropriate. 425 F.3d at 360. Without some basis for thinking the official job description is systematically unreliable, the job description is

the "pivot on which the case turns," even if a plaintiff is prepared to self-servingly testify that a job description is inaccurate. *Id.* at 360-61. By relying on the job description, a protracted and likely inconclusive factual inquiry could be avoided. *Id.* at 360.

Davis contends that the district court erred in finding the job description reliable. He argues that the process for creating the job description was systematically unreliable, and offers more than his own "self-serving" testimony as evidence. Davis points to conflicts between the job description and various ordinances in effect at the time of his removal, demonstrating the inherent unreliability and inaccuracy of the description. Moreover, he offers the testimony of David Eicks, a City Councilman, who described the process by which job classifications were reviewed as corrupt, with politically connected employees exaggerating duties in order to receive job reclassifications and pay increases. Thus, Davis claims the district court erred in applying *Riley*.

Although the district court relied solely on the job description, which may conflict with applicable ordinances, we focus our attention on the City ordinances in effect at the time of Davis's termination, which define by law the duties of the SHO. *See Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999) ("Because [plaintiff's] position . . . was clearly defined by state statute and city ordinance, we find that the district court's determination as a matter of law of the policymaking status of [plaintiff's] position was proper."). The starting point of our inquiry should be the ordinances, and not the job

description, because "[u]nlike job descriptions, which may bear little resemblance to a position's actual duties, the ordinance's terms are not open to contest*." Walsh v. Heilmann*, 472 F.3d 504, 505 (7th Cir. 2006). A job description, to the extent it is consistent with pertinent statutes or ordinances, may be relevant in providing greater detail of a position's duties and thus assisting in the determination of whether a position is best characterized as a policymaker or confidential employee. But a job description cannot be relied upon to the exclusion of a potentially conflicting statute or ordinance establishing a position's duties because any conflict between the two would have to be resolved in favor of the statute or ordinance.[1] Thus, we turn to the local ordinances establishing the duties of the SHO.

The SHO is appointed by the Mayor and given authority as "department head of the Animal Shelter and Animal Control operations." Anderson, Ind., Code § 91.10 (2008). As department head, the SHO is "responsible for supervision, implementation and enforcement of this chapter" (chapter 91 dealing with animal control matters). *Id.* The SHO's authority can potentially affect any dog or cat owner in the City because any person who owns or has custody of a dog or cat over six months of age is

---

[1] Of course, if there is no applicable statute or ordinance defining a position's duties, public officials may continue to rely solely on an official job description as a safe harbor to determine whether political affiliation is an appropriate qualification. *See, e.g., Powers v. Richards*, 549 F.3d 505, 510 (7th Cir. 2008); *Riley*, 425 F.3d at 360.

required to obtain a license. *Id.* § 91.20. The SHO is also given broad discretion in determining whether to revoke a license, and "may revoke any license if the person holding the license refuses or fails to comply with any part of this chapter, or of the regulations promulgated by the [SHO] and the Board [of Public Safety], or of any law governing the protection and keeping of animals." *Id.* § 91.24. After providing ten days' notice to the owner, the SHO may revoke a license, and the animals owned "shall be humanely disposed of." *Id.*

Moreover, the SHO is given broad discretion with respect to permits and regulations for pet stores, kennels, and animal shelters. A permit is required for the operation of any "commercial animal establishment, kennel, or animal shelter, except for the city animal shelter." *Id.* § 91.25. The SHO, with the approval of the Board of Public Safety, has authority to "promulgate regulations for the issuance of permits and may include requirements for humane care of all animals and for compliance with the provisions of this chapter and other applicable laws." *Id.* § 91.26. The SHO is also given authority to revoke a permit with ten days' notice, and can make a recommendation to the Board of Public Safety as to whether a permit should be approved. *Id.* §§ 91.29, 91.30. Finally, the position has the authority to "promulgate policies and regulations for the adoption of animals from the city animal shelter," with the approval of the Board of Public Safety. *Id.* § 91.52.

Davis principally argues that the discretion given to the SHO by City ordinances requires only the exercise

of professional or technical judgment, rather than political discretion. For example, he asserts that while § 91.26 allows the SHO to include requirements for the issuance of permits that ensure "humane care of all animals" and compliance with the law, any determination as to what constitutes the "humane care of all animals" is a professional determination. Similarly, he argues that the authority to promulgate regulations relating to the adoption of animals granted in § 91.52 does not call for any political discretion. We disagree.

The ordinances give the SHO substantial discretion to flesh out policy by promulgating regulations. While Davis argues that the discretion exercised by the SHO is professional rather than political, this contention is belied by the fact that Davis was a political hire with no technical expertise at the time of his appointment. Moreover, the ordinances authorize the SHO to promulgate regulations with broad policy goals. While everyone might agree that ensuring the humane care of all animals is an enviable goal, the concept of "humane care" is an amorphous one and subject to principled disagreement, resulting in an inevitably political interpretation. *See Pleva*, 195 F.3d at 913 ("Concepts such as 'substantial justice,' 'public interest,' 'public convenience' and 'public health, safety and welfare' are inherently subject to principled disagreement. One can only assume that individual members will flesh out the meaning of these terms with their own policy, and inevitably political, interpretations . . . .").

Despite being a basic service of local government, there may be principled disagreement over the develop-

ment and execution of animal control policies. The actions of the SHO, as head of the department and vested with the authority to promulgate regulations, can have serious political consequences. *See Tomczak*, 765 F.2d at 641 ("Elections often turn on the success or failure of the incumbent to provide [basic services such as police, fire protection, public schools, hospitals, transportation, and libraries]. . . . While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.") As we noted in *Tomczak*, one of the biggest turning points in the 1979 Chicago mayoral election involved the provision of snow-removal services. *Id.* And in *Walsh*, we commented that in at least one Midwestern city "the success of the fall leaf-removal campaign is the standard by which the people evaluate their mayors." 472 F.3d at 505 (*citing Kupstas v. City of Greenwood*, 398 F.3d 609 (7th Cir. 2005)). Animal control is no less a potentially politically-sensitive basic service provided by local governments, and the SHO is granted significant discretion that may affect policies, and thus local elections.[2]

Davis maintains that the practice of previous administrations demonstrates that the SHO could not be

---

[2] Pet owners certainly can be politically active and affect local elections. *See* Beth Duff-Brown, *DogPAC San Francisco: Dog Owners Hope to Sway Mayoral Race,* Huffington Post (Oct. 4, 2011, 4:35 AM),http://www.huffingtonpost.com/2011/10/03/dogpac-san-francisco_n_992555.html.

removed on the basis of political affiliation. Mayor Lawler settled a lawsuit with Davis's predecessor after she was terminated for political reasons, while Mayor Smith chose not to replace Davis despite replacing many other Democratic officials. The practice of prior administrations notwithstanding, the relevant inquiry is whether the SHO was a policymaker, and the ordinances reveal that the SHO was granted policymaking authority. The prior administrations may have taken these actions not because they believed that the SHO could not be removed for political reasons, but rather because they did not want to take the chance of being proven wrong in litigation. Even a party that believes it is conforming with the law faces a substantial risk in litigation. *See Rissman v. Rissman,* 213 F.3d 381, 386 (7th Cir. 2000) ("[M]any sensible people want to curtail risk (and all litigation is risky).").

City ordinances confer sufficient policymaking responsibilities to the SHO such that political loyalty was a valid qualification. The SHO is tasked with important regulatory functions involving a high level of discretion, including the authority to promulgate regulations regarding the issuance of permits, create conditions and standards for the revocation of licenses and permits, and make individual determinations on whether to issue or revoke a license. Because we find that the relevant ordinances authorize the SHO policymaking discretion, we need not consider the job description and whether Davis presented sufficient evidence to call into question its reliability.

### III. CONCLUSION

We find the applicable ordinances vest the SHO with policymaking authority and render political loyalty an appropriate consideration. Therefore, we AFFIRM the judgment of the district court.