In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1649

JAY EMBRY,

*Plaintiff-Appellant,*

*v.*

CITY OF CALUMET CITY, ILLINOIS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 3685—**Matthew F. Kennelly**, *Judge*.

ARGUED OCTOBER 3, 2012—DECIDED NOVEMBER 26, 2012

Before FLAUM, RIPPLE, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Jay Embry sued Calumet City, four city aldermen, and the city Director of Personnel under 42 U.S.C. § 1983, alleging that defendants demoted him from the position of Commissioner of Streets and Alleys as retaliation for his support of the mayor during a recent city election. Applying the *Elrod-Branti* line of political-patronage cases, the district court

granted defendants' motion for summary judgment after concluding that the commissioner is a policy-making position and that Embry could therefore be removed because of his political affiliation. *See Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality). We agree with the district court and accordingly affirm the judgment.

## I. Background

Embry started working for the Department of Streets and Alleys in Calumet City more than a decade ago. He eventually rose to the department's highest position in 2007, when Mayor Michelle Qualkinbush appointed him commissioner. The commissioner oversees the construction and repair of all streets, paving, sidewalks, and other public improvements, and also reports ordinance violations to the city council. Calumet City, Ill., Code ch. 2, art. IV, § 2-462 (1980). As commissioner, Embry supervised all day-to-day work in the department, prepared the department's annual budget of four million dollars, and managed payroll and scheduling for the department's forty employees. He also met with the mayor and other department heads to brainstorm improvements to city streets and other public ways.

During the April 2009 municipal election, Embry campaigned for the "United to Serve You" team of candidates, which included Mayor Qualkinbush and three of the four defendant-aldermen. The United team was apparently not as united as its name suggested: three defendant-aldermen broke party ranks to support defen-

dant Roger Munda over Munda's opponent, whom the mayor had endorsed. Munda won, creating a rift between the defendant-aldermen and the mayor. Embry found himself caught in the political crossfire as the defendant-aldermen urged him to stop supporting the mayor and "get on their team." Embry declined. The defendants soon criticized Embry for failing to develop a plan to cut grass on city property, even though Embry drafted and submitted a plan as requested.

A few months after the election, the city council merged Embry's department with the Sewer and Water Department, creating a single Department of Streets, Alleys, Water, and Sewer. Calumet City, Ill., Ordinance 09-33 (July 29, 2009). The Sewer Superintendent planned to retire, and Embry thought that he would be appointed commissioner of the new department. Indeed, he oversaw the consolidated department for a brief period of time. Subsequently, Mayor Qualkinbush drafted an appointment letter nominating Embry to head the new department. However, after the defendant-aldermen vowed not to ratify Embry's appointment, the mayor nominated someone else. The city council unanimously approved the new appointment. Embry then filed this lawsuit under Section 1983.

## II. Discussion

We review de novo a district court's grant of summary judgment, viewing all facts in the light most favorable to the non-moving party, in this case, Embry. *See Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). However,

we review the underlying characterization of Embry's job as a policymaking position for clear error. *Selch v. Letts*, 5 F.3d 1040, 1044 (7th Cir. 1993). Summary judgment is proper when no dispute as to material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Viewing the facts in the light most favorable to Embry, we ultimately agree with the district court that Embry held a policymaking position under the *Elrod-Branti* line of political-patronage cases, permitting his dismissal solely for political reasons.

### A. The District Court Properly Invoked the *Elrod-Branti* Exception.

As a general matter, political patronage dismissals violate the First Amendment. *See Elrod*, 427 U.S. at 360 (plurality). Certain governmental positions, though, require a "heightened need for trust and confidence that . . . subordinates are guided by the same political compass and will exercise their discretion in a manner consistent with their shared political agenda." *Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 977 (7th Cir. 2000). For these positions—dubbed "policymaking jobs"—the "government employer's need for political allegiance . . . outweighs the employee's freedom of expression[.]" *Id.* Thus, government employers may fire individuals in policymaking jobs solely because of their political affiliation. This exception applies not only when a new political party takes power, but also includes "patronage dismissals when one faction of a party replaces another faction of the same party[.]" *Tomczak v. City of Chi.*, 765 F.2d 633, 640 (7th Cir. 1985) (citations omitted).

Even these policymaking employees, though, possess a minimal level of First Amendment protection against retaliatory dismissal: the government cannot fire them for speech on public matters unconnected to political affiliation or policy viewpoints. *Bonds*, 207 F.3d at 979; *Marshall v. Porter Cnty. Plan Comm'n*, 32 F.3d 1215, 1221 (7th Cir. 1994). Dismissal for such speech only survives constitutional scrutiny if the government's interest in promoting the efficiency of its public services outweighs the employee's free speech interests. *See Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Bonds*, 207 F.3d at 979. Embry first attacks the district court's reliance on the *Elrod-Branti* political-patronage cases, arguing that *Connick-Pickering* applies instead. We disagree.

*Connick-Pickering* does not apply here because Embry identifies no statement of public concern unconnected to political affiliation or policy views that led to his dismissal. Such statements are prerequisites to *Connick-Pickering* balancing. *Bonds*, 207 F.3d at 979. Instead, Embry argues that because he publicly supported the entire "United to Serve You" slate, the defendants must have fired him for his speech on public matters other than his political loyalties. But Embry's complaint specifically alleged that defendants fired him "based on [his] political allegiance to Qualkinbush." This alone places the case squarely within the *Elrod-Branti* line. Embry resists this conclusion by characterizing his campaign activities as both speech and affiliation, but he points to no speech unrelated to his support for Mayor Qualkinbush. Because *Elrod-Branti* applies

when the public speech is nothing more than public political affiliation, *see Riley v. Blagojevich*, 425 F.3d 357, 365 (7th Cir. 2005), the *Elrod-Branti* line of cases provides the appropriate test here.

### B.   Embry's Position Qualifies as a Policymaking Position Under *Elrod-Branti.*

Because the *Elrod-Branti* line of cases controls here, Embry's dismissal does not violate the First Amendment if he held a policymaking job. An employee holds a policymaking position when "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. Political allegiance is a valid job requirement when "the position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012) (citation omitted).[1] Discretion is also important: when an employee exercises broad discretionary power, the state cannot easily fire the employee for insubordination even though "the employee's per-

---

[1] Political allegiance is also a valid job requirement when the job "gives the holder access to his political superiors' confidential, politically sensitive thoughts." *Davis*, 668 F.3d at 477 (quoting *Riley*, 425 F.3d at 359). Embry does not now suggest his position provided him such access.

formance frustrates the implementation of the administration's policies." *Selch*, 5 F.3d at 1044. We examine the powers inherent in the office when considering whether an employee holds a policymaking job, even if the employee never actually exercises those powers. *Tomczak*, 765 F.2d at 640-41 (citations omitted); *see also Riley*, 425 F.3d at 360-61. In evaluating Embry's position under *Elrod-Branti*, the parties dispute whether to look at the duties of the Commissioner of Streets and Alleys (Embry's old position) or those of the Commissioner of Streets, Alleys, Water, and Sewer (his position in the new, combined department). Because even the more limited duties of the Commissioner of Streets and Alleys satisfy the *Elrod-Branti* exception, we address only that position.[2]

We conclude Embry held a policymaking job. As commissioner, Embry planned for and oversaw construction and repair of the city's public ways. He also supervised his department's forty employees and managed its budget of four million dollars. These executive duties closely resemble those of other public-works administrators that involved "policymaking." In *Selch*, for example, a subdistrict superintendent with the Indiana Depart-

---

[2] Embry concedes that the new position of Commissioner of Streets, Alleys, Water, and Sewer performs all the duties and functions of the old Commissioner of Streets and Alleys. Thus, if the Commissioner of Streets and Alleys is a policymaking position, so too is the head of the new, combined department.

ment of Highways held a policymaking job when he coordinated all maintenance activities for his subdistrict, oversaw a budget of one million dollars, and managed over sixty employees. 5 F.3d at 1044-45. This high-level responsibility permitted him to thwart the political goals of the party in power, making party allegiance an appropriate job qualification. *Id.* at 1045-46. Indeed, the "primary function of any local government entity is the provision of services such as . . . transportation [and] . . . quasi-utility functions such as water, garbage, and sewage services. Elections often turn on the success or failure of the incumbent to provide these services[.]" *Tomczak*, 765 F.2d at 641. Here, Embry exercised similarly broad authority over construction and maintenance of Calumet City's public thoroughfares. His duties even exceeded those of the public official in *Selch*. Unlike that government employee, Embry not only implemented policy but met with the mayor and other department heads to develop new policies for improving city services. Ultimately, the commisioner's broad discretion to formulate and implement city policy places the position firmly in the policymaking category.

Not only do Embry's job duties place him in the policymaking category, the structure of his appointment does as well. The mayor appoints, and the city council ratifies, commissioners for an annual term. Such time limits allow new administrations to appoint new commissioners upon ascension to office, freeing them from the burden of appointees loyal to the previous administration. *See Heck v. City of Freeport*, 985 F.2d 305, 310

(7th Cir. 1993). Thus, the finite term of Embry's appointment further supports application of the *Elrod-Branti* exception.

Other circuits have similarly placed road, highway, and transportation supervisors within the *Elrod-Branti* exception. *See Langley v. Hot Spring Cnty., Ark.*, 393 F.3d 814, 818 (8th Cir. 2005) (road foreman who reported directly to chief executive and had significant public contact); *Gentry v. Lowndes Cnty., Miss.*, 337 F.3d 481, 487-88 (5th Cir. 2003) (county road manager who prepared a budget, hired employees, purchased equipment, and carried out general policies of the county board of supervisors); *Hoard v. Sizemore*, 198 F.3d 205, 213-14 (6th Cir. 1999) (county road foreman who decided which roads to repair, supervised twenty to thirty employees, and spoke daily with county executive); *Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir. 1994) (highway superintendent who prepared four million dollar budget, managed sixty employees, and made frequent public speeches). Only when these positions lack budgetary oversight or other supervisory powers have they fallen outside *Elrod-Branti*. *See Akers v. Caperton*, 998 F.2d 220, 224-25 (4th Cir. 1993) (ruling that county maintenance superintendents who plan routine maintenance, prepare and inspect records, and inform supervisors of road conditions do not hold policymaking positions). In short, extending the *Elrod-Branti* exception to Embry's role as supervisor creates no controversy. His discretionary authority to implement and influence policy over Calumet City's roads compels application

of the *Elrod-Branti* exception, and the City may fire him solely for political reasons.[3]


### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of defendants.

---

[3] Embry also argues that even if properly dismissed as commissioner, he should have been restored to his former position as foreman. According to Embry, in denying him his old job as foreman, defendants retaliated against him for the exercise of his First Amendment rights. But during Embry's tenure as commissioner, Calumet City abolished that position, replacing foremen with lower-paid deputy commissioners. Embry offers no evidence showing pretext in defendants' stated reason for eliminating foremen—easing budgetary strain—so the district court properly granted summary judgment in their favor. *See Greene v. Doruff,* 660 F.3d 975, 978-80 (7th Cir. 2011) (describing burden-shifting framework of constitutional retaliation claims).