In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1791

KATHLEEN HAGAN, et al.,

*Plaintiffs-Appellants*,

*v.*

PATRICK J. QUINN, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 13-3357 — **Sue E. Myerscough**, *Judge*.

SUBMITTED FEBRUARY 2, 2016[*] — DECIDED AUGUST 14, 2017

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiffs are former arbitrators for the Illinois Workers' Compensation Commission. In 2011, plaintiffs and another arbitrator brought a due process action

---

[*] This appeal is successive to No. 14-2746 and has been submitted to the original panel under Operating Procedure 6(b). We have agreed to decide the case without oral argument because argument would not significantly aid our decision-making process. See Fed. R. App. P. 34(a)(2)(C).

challenging the implementation of House Bill 1698, a workers' compensation reform statute that had terminated their six-year appointments under prior law. The district court granted summary judgment for defendants, and we affirmed, concluding that plaintiffs failed to demonstrate a clearly established right that was violated by legislation ending their six-year terms as arbitrators. *Dibble v. Quinn*, 793 F.3d 803, 814 (7th Cir. 2015) (the "Due Process Suit").[1]

In October 2011, while the Due Process Suit was pending, the Illinois governor declined to reappoint plaintiffs, which ended their employment. Two years later, plaintiffs filed this action against the governor and two of his advisors in their individual and official capacities. Plaintiffs alleged that the defendants had retaliated against them for filing the prior suit and that the retaliation violated the First Amendment to the United States Constitution and Illinois state law. Plaintiffs sought damages and an injunction providing either reinstatement or comparable state employment.

The district court dismissed plaintiffs' First Amendment claims, holding that the Due Process Suit was not protected speech under the *Connick–Pickering* line of cases. See *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). The

---

[1] Plaintiffs here did not participate in the appeal of the Due Process Suit. Former arbitrator Peter Akemann (not a party here) pursued that appeal *pro se*, and we consolidated his action with an appeal in a related case brought by former arbitrator John Dibble, No. 14-2328.

court declined to exercise supplemental jurisdiction over plaintiffs' state-law claims.[2]

We affirm, but by a different path. We need not and do not decide whether the Due Process Suit was speech on a matter of public concern as is required for a government employee to show retaliation in violation of the First Amendment. Plaintiffs' claims fail for a more fundamental reason. Plaintiffs were policymakers who could be terminated—or, more precisely, not reappointed—for engaging in "speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 358 (7th Cir. 2005) (citations omitted). A logical outgrowth of the *Elrod–Branti* line of cases, see *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), this policymaker corollary to the standard *Pickering* analysis allows

---

[2] The district court did not address plaintiffs' demand for injunctive relief. In *Dibble*, however, we rejected as moot a similar claim for reinstatement. By the time that case reached us, plaintiffs' six-year terms would have expired even apart from House Bill 1698. 793 F.3d at 807. Likewise here, even if Governor Quinn had renewed plaintiffs' appointments in October 2011, those appointments would have expired years ago. Under the Workers' Compensation Act as amended, arbitrators are generally appointed to three-year terms, with initial appointments having expired in July of 2012, 2013, and 2014. See 820 Ill. Comp. Stat. 305/14.

In the best case scenario for plaintiffs, then, even if the governor had renewed their appointments, those appointments would have expired over three years ago. Because plaintiffs' claim for injunctive relief is moot, they have no claim against defendants in their official capacities, and we need not substitute the current office holders for the named defendants under Federal Rule of Civil Procedure 25(d). This action is now only against the defendants in their individual capacities for damages.

elected officials to replace high-level and confidential employees not only when those employees merely belong to the "wrong" political party or faction but also when they engage in speech or other First Amendment activity that could undermine the policy or political goals of the officials accused of the retaliation. In this case, plaintiffs publicly challenged the implementation of House Bill 1698 as unconstitutional. They had a constitutional right to do so, but their exercise of that right came with consequences for their positions in state government that the Constitution also permits. In filing their lawsuit, plaintiffs sought to undercut a key component of the administration's workers' compensation reform initiative. That was reason enough for the governor to choose not to reappoint them as arbitrators. Given their positions in government, the First Amendment offers them no redress for the governor's choice.

I.  *Factual and Procedural Background*

We review *de novo* the district court's dismissal of plaintiffs' First Amendment claims, accepting as true plaintiffs' well-pled factual allegations and drawing reasonable inferences in their favor. E.g., *Simpson v. Brown County*, 860 F.3d 1001, 1005 (7th Cir. 2017); *Jakupovic v. Curran*, 850 F.3d 898, 901 (7th Cir. 2017). We review for abuse of discretion the district court's decision under 28 U.S.C. § 1367(c)(3) not to exercise supplemental jurisdiction over plaintiffs' state-law claims. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015).

A.  *The Due Process Suit*

Plaintiffs were employed as arbitrators with the Illinois Workers' Compensation Commission from 1989 (plaintiffs Kathleen Hagan and Gilberto Galicia), 1990 (plaintiff Joseph

Prieto), and 2003 (plaintiff Richard Peterson), until October 14, 2011. Plaintiffs allege that during the spring and early summer of 2011, articles published by Illinois media outlets drew public attention to problems with the state workers' compensation scheme. The legislature responded to these concerns. On June 28, 2011, then–Governor Quinn signed House Bill 1698 (as enacted, Public Act 97–18), amending the Workers' Compensation Act. See 820 Ill. Comp. Stat. 305/1 *et seq.*

A press release issued by the governor's office (and appended as an exhibit to plaintiffs' complaint) highlighted some of the key changes in the law. These included a substantial reduction in the medical fee schedule, implementation of new provider networks, enhanced enforcement mechanisms, and an electronic billing system. Most relevant here, the new legislation also changed the appointment scheme for arbitrators who decide employer/employee disputes. Notwithstanding prior law that established six-year terms for arbitrators and protected them from early discharge except for cause, the amended Act terminated all appointments effective July 1, 2011, but with the proviso that incumbents would "continue to exercise all of their duties until they are reappointed or their successors are appointed." 820 Ill. Comp. Stat. 305/14. Going forward, appointments were to be made by the governor with the advice and consent of the state senate. Initial appointments would last for one, two, or three years to set up classes of arbitrators with staggered terms. Thereafter, arbitrators would be appointed to three-year terms.

Unhappy with some of these changes—including the abrupt dissolution of their six-year terms—plaintiffs here and

fellow arbitrator Peter Akemann sued the governor and members of the Workers' Compensation Commission. In their Due Process Suit, plaintiffs alleged principally that the amended law unconstitutionally deprived them of their property interest in their employment. Plaintiffs sought damages, a declaration that House Bill 1698 was unconstitutional as applied to them, and an injunction prohibiting defendants from removing them from office or "taking any other action in retaliation for the Plaintiffs' protection of their civil rights."

The district court granted summary judgment for defendants, rejecting plaintiffs' due process claim on its merits. *Hagan v. Quinn*, No. 11-CV-3213, 2014 WL 3052631, at *3 (C.D. Ill. July 7, 2014). We affirmed on alternative grounds, holding that plaintiffs "failed to demonstrate a clearly established right that was violated by legislation ending their six-year terms as arbitrators" and that defendants were thus entitled to qualified immunity. *Dibble*, 793 F.3d at 814.

B.  *The Retaliation Suit*

On October 14, 2011, after plaintiffs filed the Due Process Suit but long before that case was decided, Governor Quinn decided which arbitrators would continue with their employment and which would be terminated. Plaintiffs were among those who were not reappointed. Two years later, plaintiffs filed this action alleging retaliation in violation of the First Amendment and the Illinois State Officials and Employees Ethics Act, 5 Ill. Comp. Stat. 430/1-1 *et seq.* Plaintiffs sued Governor Quinn; his chief of staff, Jerome Stermer; and an advisor, Velisha Haddox, in their individual and official capacities.

In their retaliation complaint, plaintiffs allege that their participation in the Due Process Suit was the "sole reason" they were not reappointed as arbitrators. Though plaintiffs concede that they each had a "personal motivation" in bringing the Due Process Suit, they insist that "their justifications for doing so were not limited to their personal interest." Rather, they felt it was "important to, in a public forum, hash out concerns … regarding the workers' compensation reforms and to outline that the governor of the State of Illinois had violated the United States Constitution." According to plaintiffs, their speech/petitioning was their way of participating in a "significant public debate on an issue of importance to the people of the State of Illinois."

The district court disagreed. In granting defendants' motion to dismiss, the court held that, as a "matter of law, Plaintiffs' lawsuit to protect their jobs was not constitutionally protected speech." *Hagan v. Quinn*, 84 F. Supp. 3d 826, 827 (C.D. Ill. 2015). Applying the *Connick–Pickering* framework for assessing First Amendment claims by government employees, the district court concluded that the Due Process Suit was not speech on a matter of public concern. Citing the admonition in *Connick* that courts must take account of the "content, form, and context" of an employee's speech, 461 U.S. at 147–48, the district court reasoned that the Due Process Suit "cannot fairly be said to be about worker's compensation reform from a public view standpoint" but was instead a "purely personal" attempt by plaintiffs to "protect their jobs and reputations." *Hagan*, 84 F. Supp. 3d at 831–32. The court held in the alternative that defendants were entitled to qualified immunity. *Id.* at 832–33.

The district court dismissed plaintiffs' First Amendment claims with prejudice. The court dismissed their state Ethics Act claims without prejudice, declining to exercise supplemental jurisdiction over those state-law claims. *Id.* at 833. Plaintiffs have appealed both dismissals.[3]

II. *Analysis*

A. *First Amendment Retaliation Doctrine*

Employees do not give up all First Amendment rights when they accept government employment. See *Lalowski v. City of Des Plaines*, 789 F.3d 784, 790 (7th Cir. 2015). Rather, the First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen about matters of public concern. Whether the First Amendment protects the speech is a question of law that we review de novo." *Matrisciano v. Randle*, 569 F.3d 723, 730 (7th Cir. 2009) (citations omitted), abrogated in part on other grounds by *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009).

To establish a First Amendment retaliation claim, a public employee must show that "(1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her

---

[3] Oddly, the judgment order entered by the clerk states that the *case* was dismissed without prejudice. That was plainly a clerical error. While the district judge declined to exercise supplemental jurisdiction over the Ethics Act claims and thus dismissed that count without prejudice, she held that the First Amendment count was dismissed "for failure to state a federal claim." *Hagan*, 84 F. Supp. 3d at 833. She added that the "case is closed," and she directed the clerk to enter a judgment pursuant to Federal Rule of Civil Procedure 58. *Id.* Perhaps the clerk simply misread the order appended to the district judge's opinion, but it is the district judge's responsibility to ensure that the judgment accurately reflects the judge's intentions. In any event, our appellate jurisdiction is secure.

employer's action; and (3) her protected speech was a but-for cause of the employer's action." *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013); see also *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) ("Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was at least a motivating factor … of the employer's decision to take retaliatory action against him. Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. If the employer fails to counter the plaintiff's evidence, then … the plaintiff has established the but-for causation needed to succeed on his claim.") (citations omitted).

While the speech at issue in government employment cases often involves controversial remarks by employees in the workplace or directed to the media, the First Amendment reaches many forms of expression. In *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 383 (2011), a former police chief filed a union grievance challenging his termination. An arbitrator ordered the chief reinstated. The borough council then issued a series of directives that the chief considered unfair (and that the arbitrator later ordered the council to modify or rescind). *Id.* at 383–84. The chief filed a federal § 1983 action claiming that his union grievance was protected under the First Amendment's Petition Clause and that the directives were retaliation for that protected activity. After the chief filed his suit, the borough council denied his request for overtime compensation, and he amended his complaint to allege that the § 1983 suit was itself protected under the Petition Clause and that the overtime denial was another instance of unconstitutional retaliation. *Id.* at 384.

In reviewing the chief's First Amendment claims, the Supreme Court recognized that he "just as easily could have alleged that his employer retaliated against him for the speech contained within his grievances and lawsuit." *Id.* at 387. The Court held that the ordinary framework for assessing retaliation claims applies with equal force when the speech at issue is conveyed through a lawsuit or other petition. *Id.* at 398; see *Gibson v. Kilpatrick*, 838 F.3d 476, 481 (5th Cir. 2016) (retaliation claims brought by government employees under the Speech Clause and the Petition Clause are "analyzed in the same way").

It makes good sense to take the same approach to retaliation claims arising under the Speech and Petition Clauses. "Petitions, no less than speech, can interfere with the efficient and effective operation of government." *Borough of Duryea*, 564 U.S. at 389. Yet petitions such as lawsuits are important mechanisms for citizens (including government employees) to make their voices heard and to seek to hold public officials accountable. See *id.* at 395–97 (tracing the history of the right to petition from the Magna Carta through the founding era and the modern civil rights movement).[4]

---

[4] In an analogous context of First Amendment retaliation claims by prisoners, we apply the same test whether the expressive activity is in the nature of a petition or some other form of speech. E.g., *Bridges v. Gilbert*, 557 F.3d 541, 551–52 (7th Cir. 2009) (inmate stated First Amendment claim for retaliation in response to his submission of an affidavit in a separate suit filed by fellow inmate's mother); *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) (inmate may state valid First Amendment claim for retaliation in response to grievance regardless whether inmate reduced his complaints "to writing on an official grievance form" or expressed them orally). In the prison context, "we examine whether the prisoner engaged in speech in a manner consistent with legitimate penological interests,"

As this discussion shows, for purposes of assessing these plaintiffs' First Amendment retaliation claims, it makes no difference that plaintiffs' expressive activity took the form of a complaint in federal court rather than a conversation in the workplace, a press conference, a Facebook post, or a tweet on Twitter. Plaintiffs can prevail if, but only if, they can demonstrate that the Due Process Suit was protected speech/petitioning activity and that defendants took an adverse action against them because of that protected activity. As we explain below, plaintiffs cannot carry their burden.

B.  *The Policymaker Corollary to the Pickering Analysis*

In evaluating plaintiffs' retaliation claims, the district court focused on the first element of the claims, i.e., whether the Due Process Suit was constitutionally protected speech on a matter of public concern. We also consider whether plaintiffs' speech/petition was constitutionally protected, but our approach differs from the district court's. Because we conclude that plaintiffs were "policymakers" and that the governor could lawfully decline to reappoint them for speaking out against his administration's workers' compensation reform

---

though we do not require the prisoner to show that he spoke on a matter of public concern (even if the prisoner was employed by the prison, as many inmates are), and in that respect prisoner claims are analyzed somewhat differently than public-employee claims. See *Watkins v. Kasper*, 599 F.3d 791, 795 (7th Cir. 2010). Compare *Herron v. Meyer*, 820 F.3d 860, 864 (7th Cir. 2016) (observing that "decisions in the prison-grievance line do not explain why the First Amendment offers greater protection to prisoners than to public employees"), with *Ogurek v. Gabor*, 827 F.3d 567, 569 (7th Cir. 2016) (citing *Watkins*, 599 F.3d at 795, for proposition that "the dynamics of the government's relationships with prisoner-employees and with public employees are too dissimilar to transfer the public concern test to the prison context").

initiative, we need not and do not decide whether the Due Process Suit was speech on a matter of public concern.

In *Elrod v. Burns* and *Branti v. Finkel*, the Supreme Court prohibited government employers from dismissing most public employees on the basis of partisan affiliation, holding that the age-old practice of patronage firings violated the First Amendment. At the same time, the Court recognized an exception for employees who occupy policymaking or confidential positions. Elected officials may require political loyalty from such employees so that representative government is not "undercut by tactics obstructing the implementation of policies … presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367 (plurality opinion); see also *Branti*, 445 U.S. at 517 ("[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency."); cf. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990) (extending *Elrod* and *Branti* to hold that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees").

While acknowledging that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions," the plurality in *Elrod* emphasized that the "nature of the responsibilities is critical," and that an employee whose responsibilities are broad in scope, who acts as an adviser, and/or who "formulates plans for the implementation of broad goals" likely occupies a policymaking role. 427 U.S. at 367–68 (plurality opinion). In *Branti*, the Court said again that it is "not always easy to determine whether a position is one in which

political affiliation is a legitimate factor to be considered." 445 U.S. at 518. The Court reasoned that under some circumstances, a job "may be appropriately considered political even though it is neither confidential nor policymaking in character" (e.g., an election judge hired pursuant to a state law requiring one Republican and one Democrat to monitor each precinct). *Id.* Conversely, "party affiliation is not necessarily relevant to every policymaking or confidential position" (e.g., a university football coach). *Id.* The ultimate inquiry, the Court concluded, is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* The policymaker label is thus shorthand for a broad category of public employees whose work is politically sensitive and who exercise significant discretion in the performance of their duties.

Despite the unusual cases contemplated in *Branti* and the Supreme Court's emphasis on a functional rather than a definitional approach to assessing patronage dismissals, this court has "recognized that the terms '[p]olicymaking' and 'confidential' do accurately describe the vast majority of offices that fall within the realm of legitimate patronage under the *Branti* formulation." *Kiddy-Brown*, 408 F.3d at 355 (alterations in original; internal quotation marks omitted), quoting *Meeks v. Grimes*, 779 F.2d 417, 420 (7th Cir. 1985); accord, *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012); *Matlock v. Barnes*, 932 F.2d 658, 662 (7th Cir. 1991).

We have held that the "test for whether a position involves policymaking is 'whether the position authorizes, either directly or indirectly, meaningful input into government deci-

sionmaking on issues where there is room for principled dis-
agreement on goals or their implementation.'" *Kiddy-Brown*,
408 F.3d at 355, quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170
(7th Cir. 1981). To make this determination, we consider the
"powers inherent in a given office, as opposed to the functions
performed by a particular occupant of that office." *Id.*, quot-
ing *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir. 1985);
see also *Embry v. City of Calumet City*, 701 F.3d 231, 236 (7th
Cir. 2012) ("We examine the powers inherent in the office …
even if the employee never actually exercises those powers.").

"We further ask whether the position entails the exercise
of a substantial amount of *political* (as distinct from profes-
sional) discretion." *Powers v. Richards*, 549 F.3d 505, 510 (7th
Cir. 2008). This inquiry is not always straightforward. See *Ri-
ley v. Blagojevich*, 425 F.3d 357, 360 (7th Cir. 2005) ("In general
… employees whose discretion is channeled by professional
rather than political norms … are not within the exception for
policymakers. But the line between professional and policy
judgment is often blurred; for example, is the physician who
runs a county hospital making a professional judgment or a
policy judgment if he decides to authorize the hospital's phy-
sicians to assist suicides, prescribe 'medical marijuana,' or
perform abortions?").

In this case, of course, we may not assume that the plaintiff
arbitrators were terminated because of their partisan affilia-
tion. Rather, plaintiffs allege that the "sole reason" for their
termination was their participation in the Due Process Suit,
i.e., their speech/petition. Taking that allegation as true, we
nonetheless conclude that the policymaker exception bars
plaintiffs from pursuing their First Amendment retaliation
claim.

In *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993), we considered the "intersection" between the *Connick–Pickering* cases that concern the rights of public officials to "discipline an employee who speaks out on a matter of public significance in a way displeasing to them" and the *Elrod–Branti* cases that concern the rights of such officials to "hire or fire an employee on the basis of his affiliation with a political party or faction."

Wilbur was a deputy sheriff, which is deemed a policymaking position in Illinois. He suffered an adverse employment action not because of his political affiliation (he and the sheriff were both Democrats) but because of his political speech and activity. 3 F.3d at 215. After the sheriff decided to run for re-election, Wilbur announced his own candidacy. The sheriff then amended office regulations to provide that any employee who ran for sheriff could be placed on unpaid leave. According to Wilbur, the sheriff's actions not only harmed him financially but crippled his campaign.

We recognized that, at "first blush the facts … present[ed] a blatant case of retaliation for the exercise of the right of free speech," *id.*, but we concluded that the district court rightly dismissed Wilbur's First Amendment claim. *Id.* at 217. Wilbur's expressive conduct (campaigning against his boss) brought him within the "scope of the concern that gave rise to the exceptions in the patronage cases." *Id.* The concern "is with the effects on the operations of government of forcing a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends." *Id.* at 217–18. It would be a strange rule, we reasoned, that "gave more job protection to policymaking employees who vociferously attack their superiors than to policymaking employees who

do their best to serve … but have the misfortune to belong to the wrong party." *Id.* at 219. In effect, the policymaker exception to the *Elrod–Branti* line of cases protects elected officials from the risk that employees politically opposed to them might undermine their policies. The policymaker corollary to the *Connick–Pickering* line of cases allows those elected officials to respond to actual political attacks from those employees, at least as a matter of First Amendment law.

In *Warzon v. Drew*, 60 F.3d 1234, 1235, 1237 (7th Cir. 1995), we extended the reasoning of *Wilbur* to a case in which a county controller, who was responsible for the "financial management and administration" of the county healthcare plan, was fired after speaking out publicly against the county's healthcare policy. Noting again that the goals underlying the *Connick–Pickering* and *Elrod–Branti* cases are "really very closely linked," we held that "if Warzon was a confidential or policymaking employee, her superiors could, consistent with the First Amendment, fire her for advocating positions in conflict with their stated policies." *Id.* at 1238–39. Finding that Warzon's pleadings were "replete with information showing that she had significant input into and authority over" the healthcare plan, we concluded that she was a policymaker and affirmed dismissal of her First Amendment claim. *Id.* at 1239–40.

Following *Wilbur* and *Warzon*, we have recognized that "in cases involving the dismissal of an employee in a policymaking position, 'there is no need for a fact-specific analysis of the circumstances of each case' mandated by *Pickering*." *Kiddy-Brown*, 408 F.3d at 358 (citation omitted). Instead, under the "policy-maker corollary to the *Pickering* analysis, the First

Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Id.* (citations and internal quotation marks omitted). Accord, e.g., *Embry*, 701 F.3d at 235 ("*Connick–Pickering* does not apply [where policymaker] identifies no statement of public concern unconnected to political affiliation or policy views that led to his dismissal."); *Vargas-Harrison v. Racine Unified School District*, 272 F.3d 964, 971 (7th Cir. 2001) ("In essence, we have determined that, with respect to [policymaking] employees, the *Pickering* analysis regularly will result in a determination that 'the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates *Pickering* balancing.'"), quoting *Bonds v. Milwaukee County*, 207 F.3d 969, 977 (7th Cir. 2000); cf. *Matrisciano*, 569 F.3d at 731 ("We have not limited th[e] 'policy-maker corollary' to instances where the plaintiff's political views led to the adverse action.") (citations omitted).

C. *Application*

Plaintiffs' First Amendment retaliation claims are barred by the policymaker corollary to the *Pickering* analysis. In applying the policymaker corollary, we consider two criteria: "First, the employee must have occupied a policy-making position. If so, his speech must have been of the kind that falls within the scope of the corollary." *Matrisciano*, 569 F.3d at 731 (citations omitted). Plaintiffs' complaint shows that both criteria are satisfied here.

First, the plaintiffs were policymakers for First Amendment purposes. As noted above, the test for determining

whether a position involves policymaking is "whether the po-
sition authorizes … meaningful input into government deci-
sionmaking on issues where there is room for principled dis-
agreement on goals or their implementation." *Kiddy-Brown*,
408 F.3d at 355 (citation omitted); see also *Allen v. Martin*, 460
F.3d 939, 944 (7th Cir. 2006) (finding informative the "degree
of discretion and responsibility exercised in the position").

The test is flexible, and we have recognized a variety of
roles, not all at the highest levels of management hierarchies
or at the center of the political limelight, that qualify as poli-
cymaking positions or otherwise fall within the scope of the
*Elrod–Branti* patronage exception. E.g., *Embry*, 701 F.3d at 236
(city commissioner of streets and alleys); *Davis*, 668 F.3d at 480
(senior humane officer for city board of public safety); *Allen*,
460 F.3d at 945–46 (accounting bureau chief for state transpor-
tation department); *Vargas-Harrison*, 272 F.3d at 973 (elemen-
tary school principal); *Bonds*, 207 F.3d at 977 (senior fiscal an-
alyst for city block grant committee); *Selch v. Letts*, 5 F.3d 1040,
1047 (7th Cir. 1993) (subdistrict superintendent for state high-
way department); *Heck v. City of Freeport*, 985 F.2d 305, 310 (7th
Cir. 1993) (general inspector for local health department); *Up-
ton v. Thompson*, 930 F.2d 1209, 1218 (7th Cir. 1991) (deputy
sheriff); *Bicanic v. McDermott*, 867 F.2d 391, 395 (7th Cir. 1989)
(administrator of city parks and recreation); *Livas v. Petka*, 711
F.2d 798, 801 (7th Cir. 1983) (assistant state's attorney).

At the Rule 12(b)(6) stage, we do not have materials such
as an employment manual or a detailed job description listing
the tasks plaintiffs were required to perform while employed
as arbitrators. However, we do have the statutes establishing
and governing these positions, and where a statute estab-

lishes a position, the statute is likely to provide the best foundation for classifying it for these First Amendment purposes. See *Davis*, 668 F.3d at 478 ("The starting point of our inquiry should be the ordinances, and not the job description, because '[u]nlike job descriptions, which may bear little resemblance to a position's actual duties, the ordinance's terms are not open to contest.'") (alteration in original) (citation omitted); *Vargas-Harrison*, 272 F.3d at 972 ("[W]hen the duties and responsibilities of a particular position are clearly defined by law and regulations, a court may resolve this [policymaker] issue without the aid of a finder of fact."); *Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999) ("Because [plaintiff's] position … was clearly defined by state statute and city ordinance … the district court's determination as a matter of law of the policymaking status of [plaintiff's] position was proper … .").

The statutes here confirm that plaintiffs were policymakers. Under both the current version of the Workers' Compensation Act and the version in effect when Governor Quinn declined to reappoint the plaintiffs, arbitrators are selected by the governor with the advice and consent of the state senate. 820 Ill. Comp. Stat. 305/14. Newly appointed arbitrators are subject to an extensive professional training program covering substantive and procedural aspects of their position, and all arbitrators are required to complete twenty hours of training every two years. *Id.*

Arbitrators are required to "dispose of all Workers' Compensation matters promptly, officially and fairly, without bias or prejudice," and to "be faithful to the law and maintain professional competence in it." 820 Ill. Comp. Stat. 305/1.1(a). Arbitrators are empowered to make findings of fact "based on inquiries, investigations, examinations, or inspections" and to

enter those findings into the record of the proceeding. 305/1.1(e). Arbitrators may be assigned to serve as acting members of the Workers' Compensation Commission whenever a duly appointed commissioner is unavailable. 305/14. In that substitute capacity, arbitrators serve alongside other commissioners in administering the Act, promulgating procedural rules, and hearing cases en banc. 820 Ill. Comp. Stat. 305/13. Arbitrators also may be elected by a vote of their fellow arbitrators to serve on the Commission Review Board, an advisory body designated to review complaints brought against commissioners and arbitrators. 820 Ill. Comp. Stat. 305/14.1. In "matters of serious concern to the State," the review board may "recommend that the Governor: 1) dismiss any Arbitrator who is found unfit to serve; or 2) not reappoint a Commissioner who it finds unfit to serve." *Id.*[5]

Illinois workers' compensation arbitrators are not and never have been ministerial employees. They exercise substantial discretion in adjudicating employer/employee disputes and may participate in rulemaking to the extent they serve on the Workers' Compensation Commission. As adjudicators, they are also gatekeepers. While the Illinois legislature enacted the state's workers' compensation scheme, as a practical matter it is the arbitrators who resolve conflicts over which employees should and should not benefit from this important state program. Over time, the decisions of the arbitrators, which are appealable to the Workers' Compensation

---

[5] Many of these statutory provisions were in effect even prior to enactment of House Bill 1698.

Commission and ultimately to the state courts, shape the direction of Illinois policy as it relates to workers' and employers' rights.

Treating these plaintiffs as policymakers is consistent with a series of our decisions recognizing that judges and hearing officers typically occupy policymaking roles for First Amendment purposes. Compare *Kurowski v. Krajewski*, 848 F.2d 767, 770 (7th Cir. 1988) ("A judge both makes and implements governmental policy. … Holders of the appointing authority may seek to ensure that judges agree with them on important jurisprudential questions."), with *Walsh v. Heilmann*, 472 F.3d 504, 505 (7th Cir. 2006) ("Neither the judge nor the hearing officer operates in a zone where decisions are mechanical. That's why we held in *Kurowski* … that politics is a permissible consideration for judicial positions (even those held for just a short time); the same is true of hearing officers who possess discretion over which laws receive how much enforcement."); see also *Thompson v. Illinois Dep't of Professional Regulation*, 300 F.3d 750, 757 (7th Cir. 2002) (chief administrative law judge in state department of professional regulation was policymaker); *Pleva*, 195 F.3d at 913 (member of city board of zoning appeals was policymaker).

As gubernatorial appointees, the arbitrators are the face of the administration in the workers' compensation arena. As the governor's 2011 press release emphasized, enhanced requirements for arbitrator performance and accountability were among the key changes implemented by House Bill 1698. The restructuring of the arbitrator corps was a central feature of the reform initiative. In the spirit of the exception to the *Elrod* and *Branti* principles, the governor is entitled to ap-

point and retain only those arbitrators in whom he has confidence and who he believes will faithfully carry out their official mission.

Turning to the second criterion of the policymaker corollary, we conclude that plaintiffs' speech/petitioning activity (through the Due Process Suit) fits comfortably within the scope of the corollary. In their underlying due process complaint, plaintiffs accused the governor of "an arbitrary and capricious act allowing him to take the protected property rights of plaintiffs without due process." They sought to enjoin the governor and other state defendants from removing them from office or appointing any other person to fill their remaining terms, and they asked the court to declare the reform legislation unconstitutional as applied to them. Plaintiffs also sought substantial damages.

In their retaliation complaint, plaintiffs confirmed that their goal had been to "hash out concerns that they had regarding the workers' compensation reforms and to outline that the governor of the State of Illinois had violated the United States Constitution." Building on that theme in their appellate brief, plaintiffs argue that the "underlying lawsuit … had it been successful, would have had the practical impact of protecting not only the plaintiffs but also … all of the arbitrators in the state." Plaintiffs, in other words, "engaged in speech … in a manner that is critical of superiors or their stated policies," *Kiddy-Brown*, 408 F.3d at 358 (citations omitted), exactly the type of speech to which the policymaker corollary applies.

This case is strikingly similar to *Warzon v. Drew*. In finding that the county controller in that case could be fired for speaking out against healthcare policy, we reasoned that "[n]o one

could argue … that the seriousness of and the appropriate remedy for [a] perceived crisis in government-provided medical care are not political issues." 60 F.3d at 1239; see also *Vargas-Harrison*, 272 F.3d at 974 (school district could punish principal for speaking out against grant proposal where her stance "placed her in square opposition to the stated goals and policies of her superiors").

Likewise, workers' compensation reform, which plaintiffs themselves have characterized as a "significant issue of public concern" and "the upper echelon of matters of public policy," is inherently political and intertwined with plaintiffs' duties as arbitrators. Through their lawsuit, plaintiffs aimed to undercut the governor's policy. They wanted it declared unconstitutional. A lawsuit, at least as much as public criticism or statements to the media, could unravel a policy agenda. See *Borough of Duryea*, 564 U.S. at 389–90 ("Petitions, no less than speech, can interfere with the efficient and effective operation of government. … When a petition takes the form of a lawsuit against the government employer, it may be particularly disruptive."). Assuming, as plaintiffs have alleged, that Governor Quinn chose not to reappoint them because of the Due Process Suit, he acted within constitutional bounds in making that choice.[6]

---

[6] In their brief in opposition to the defendants' motion to dismiss (but not in their appellate brief), plaintiffs urged that if the district court should "conclude that the complaint is factually lacking," the court should afford them an "opportunity to file an amended complaint." However, plaintiffs offered no explanation as to any revisions they might include in such an amended complaint, nor did they submit a proposed amended complaint or file a motion for leave to amend. While we "ordinarily hesitate before affirming a final judgment of dismissal when the plaintiff seeks leave to amend," in this case, any amendment with respect to plaintiffs' federal

D.  *State-Law Claims*

We close with a brief word on plaintiffs' claims under the state Ethics Act. The district court declined to exercise supplemental jurisdiction over these claims, as is expressly permitted under 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim … if … (3) the district court has dismissed all claims over which it has original jurisdiction[.]").

The usual practice in this circuit is for district courts to "dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); see also *Al's Service Center v. BP Products North America, Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims, which the plaintiff can then prosecute in state court.") (citations omitted).

Plaintiffs offer no argument in their appellate brief to justify a departure from this usual course, and they certainly do not show that the district court abused its discretion. On the contrary, the court might well have abused its discretion if it had retained jurisdiction over a strictly state-law claim in an area where important state policy goals may conflict. Whether a lawsuit like the Due Process Suit, filed by state policymak-

---

claim would be futile. See *Doermer v. Callen*, 847 F.3d 522, 528 (7th Cir. 2017); see also *Foman v. Davis*, 371 U.S. 178, 182 (1962) (despite liberal pleading standard of Federal Rule of Civil Procedure 15(a), courts may deny leave to amend where amendment would be futile).

ers, should qualify as protected activity under the Illinois Ethics Act, and whether these policymakers should be entitled to recover for their allegedly retaliatory discharge, are questions better left for Illinois courts to resolve. See § 1367(c)(1) (providing that district courts may decline to exercise supplemental jurisdiction over a claim that raises a "novel or complex issue of State law").

The judgment of dismissal is AFFIRMED.